Watts & S.
1ws 68
144 562
1ws 68
188 579

# Nieman *against* Ward.

A return of survey into the Surveyor General's office, and a lapse of twenty-one years afterwards, without any attempt made during that time to take exception or object to it, is conclusive evidence that it was regularly made.

Reputation and hearsay is such evidence as is entitled to respect in a question of boundary, when the lapse of time is so great as to render it difficult to prove the existence of the original land-marks.

If the court, in their charge to the jury, refer to the evidence and comment upon it, it is but right that they should bring every part of it which bears upon the point to their notice, so that they may not be misled. And if the court instruct the jury that they can see no evidence which leads to a certain conclusion, when there is such evidence, it is error.

ERROR to the Common Pleas of *Juniata* county.

Joseph T. Ward against Peter S. Nieman. This was an action of ejectment for a tract of land.

The plaintiff, to support the issue on his part, gave in evidence a warrant to Jacob Marks, dated 21st November 1837, a deed of the 4th December 1838, of Jacob Marks to Joseph T. Ward, the plaintiff, and a patent from the commonwealth dated 21st January 1839.

The defendant, being in possession of the land, relied in his defence upon a warrant to Robert Ramsey, dated the 3d June, 1774, "for one hundred and fifty acres of land in Cumberland county, on the north branch of the Cockalamus creek, a little above John Jones's claim, including a large bottom where Ramsey's improvement is." A survey in pursuance of this warrant, dated 25th July, 1774, returned 26th May, 1784, for 169 acres, 62 perches, and allowance.

The defendant then called William M'Allister, the deputy surveyor of the county, who produced several official surveys, one dated 5th January 1785, in the name of Gideon Gilpin; another in the name of Robert Patterson, on warrant, dated 14th June, 1803, surveyed 20th May, 1823; another to Henry and Jacob Auker, surveyed 20th August 1818, all calling for the Robert Ramsey survey, and identifying the land in dispute as having been surveyed for Robert Ramsey.

William M'Allister sworn. The first I knew of this land in dispute was in 1815. Arthur M'Knight called on me; I met him in the woods. He had a Thomas Jones there, who pretended to show a corner. He took us to a birch tree, on the west side of the creek, and I ran the line bearing to the east, agreeably to the Robert Ramsey draft. We run the line calling for $39\frac{1}{2}$ rods to a white oak, and found no corner; think we found no marks. We

went back to the birch, and took the other course, on the line bearing S. 15° W., reversing the course. I followed the courses and distances of that line, and the other lines round all except the one next the white oak I hunted for. The original draft said that that had not been run. I made a good deal of search myself, and those with me, and we could not find any evidence of marks, either lines or corners. M'Knight was along. It was all in the woods; considerable distance above and below was all woods at that time; found no lines or corners. I know the creek above, and lands all about there. There are streams above. I was called on by both parties to ascertain lines further up. I know of a birch tree on the same side of the creek about 100 rods further up. From that upper birch I first run the east course on the Ramsey draft. I found marks, but whether for a road or survey I don't know. There is a house near it. I found no corner; I then returned to the birch again. Then I took the other on the draft, and after running about twenty perches, I discovered some blazing; I went and examined round, and found a great deal of blazing, but it did not satisfy me that it was the old survey. There was a good deal of marking on the upper birch, but not what satisfied me that it was a corner. After running on the line forty rods, I came into a cleared field. I found a large chestnut oak, which bore evidence that it might have been ancient enough for this survey. I then went on, got through the field into the woods, and found no marks giving evidence of a line so far as the draft called for; and twenty rods further, and still found nothing. I took the next course, S. 8° W. 51, run it, and found no marks. When the distance came out, called for a white oak. I found a good many white oak stumps, but no corner. The representation on the draft shows the white oak near the water, and it was twenty rods off, I think. The water does not suit the draft so well here as it does below, (from lower birch). Where the defendant lives has always, since I was there, been called the Ramsey tract. I dont know that it was then.

The Ramsey draft says on the east a very high hill, and as regards the high hill, the ground would suit as well the one place as the other. When I started at the upper birch, if I had started ten or twelve rods lower down, the streams would suit as well here as below. The way I run, the streams were too far apart to embrace more than one in the survey.

That first (or lower) birch I supposed to be a corner, but I do not know that it is the same birch on the land of defendant. I presume it is the same, but am not certain. The adjoining survey above runs to the lower birch, and made that the line, and kept along the line of the Ramsey draft.

I made the survey on plaintiff's warrant, dated 21st November 1837.

In pursuance of this warrant, I went on to make the survey. As soon as I discovered they were *going to* take in this land, called the Ramsey land, I objected. They stated they would be able to satisfy me the Ramsey tract did not lie there. We commenced, and ran to near where we considered the Ramsey land was; then they told me they would take me up the creek. They then took me to the upper birch before described, and we there run the lines as before stated. The warrantee, Marks, said I must be satisfied now that the Ramsey land did lie there. I stated I did not think that was sufficient. After talking about it a while, I was insisted upon to go down, and to go on with the survey where we left off. I followed the lines of Auker's survey, and followed all the surveys round to take in all the vacant land, and took in more land than was claimed by defendant. After I completed the survey, I stated if I made a return on it I would put a note on it that the Ramsey land was said to be there. I did not make the return till I went myself. When I went there, I saw the surveyor general, and made the return. I made every reasonable search I could make to find the lines of the Ramsey survey, but could not find them.

William Webster sworn. Jacob Marks took me there and showed me the land, and wanted to buy it from me, and offered me $100 for it. I agreed to take it, and he would come by such a time, pay me $15 on it, and article with me. He did not come on. The land he took me to was the Ramsey tract, below Auker's saw-mill, where Nieman, the defendant, now lives. He took me down to where the lower line was, next Castle's; took me up the hollow, where he said a man was cutting timber off it to make shingles, and got his children to carry blocks over the line, after he made them. Marks showed me this in 1835. He was to come and article the same fall. Don't know why he did not come.

Daniel Heiser sworn. I was with Marks some months before he took his warrant out for this land. He got me and David and Samuel Reed and Andrew Sawyers to go round a piece of land he considered and that was supposed by the neighbours to be vacant land. We then started at a line called Castle's, and when we were going round he told us we must be particular and make no marks, nor to encroach on the Ramsey tract of land. The same tract he showed me as being the Ramsey tract is the same land that Nieman lives on.

John Jones sworn. I carried chain round this land twenty-eight or thirty years ago, for Esquire M'Knight; old Mr. P. Law was the surveyor. I was there two days. We got a birch corner somewhere below where Auker's saw-mill is now, and found no other lines or corners.

I know the Jones tract: it goes up a little above the lower part of what is said to be the Ramsey tract, where Nieman now lives;

[Nieman v. Ward.]

after our search, Esquire M'Knight gave it up; we thought it was not very easy to be got.

There is a bottom on this side of the creek, between the creek and the road opposite Nieman's house—a pretty clever bottom; it is not the largest in the neighbourhood where Auker's saw-mill is; it is larger a few rods above.

William M'Allister again. The run marked on Ramsey's draft, as crossing line N. 30° E. 82 ps. to a W. O., is the same run marked on the Gilpin draft, as crossing the line N. 27° W. 218 ps. to a W. O. on the latter draft where the present defendant now claims. The lines are all marked round the Gilpin survey; I do not know that to be the Ramsey survey, but I know the run going through the Gilpin tract is the same where defendant now claims. Mr Jones's improvement is below the tract Nieman now lives on; between sixty and one hundred rods, as I have been told.

The land of David Reed lies to the east and north-east of Nieman, between sixty and one hundred rods; Samuel Reed lies between David Reed and the Nieman claim, and runs alongside of it; runs further north; don't go so far to the south as the Nieman claim. Joseph Castle is forty rods south of Nieman, principally lies on the east side of the creek, and crosses to the west. The survey touches all the boundaries, and perhaps some more than called for in the warrant. This survey does not touch any land David Reed now owns, but it was originally surveyed on a warrant in his name; Andrew Sawyer it touches, which was a part of the David Reed survey on the east. There was no person in possession of the land when I executed Marks's warrant; there was no improvement on it of any kind: it was altogether woods—wild land—Marks and Ward were along when I executed the warrant.

Henry Auker affirmed. I have been along the creek many a time, and the largest bottom along it, I think, is where Nieman lives; I have been there for twenty-five or thirty years, and never saw any improvement till Nieman improved it; he began there in 1838, in the winter; and moved there the 1st of April 1838.

David Reed sworn. I did see a corner on a W. O. above Auker's saw-mill; who claimed it, I don't know; it was on the line from the lower birch; I never examined to see how old it was; don't know how old it was; I saw it once hunting. When we were round fixing the boundaries for Marks, we did not include what we supposed to be the Ramsey land; the piece me and Heiser and him went round was all I certified to, and said if he could find any more it was well; the tree I supposed to be a corner, I saw no pointers about; it was marked, as I supposed, a corner. I never knew any lines of the Ramsey survey; the white oak I spoke of is about forty rods from the lower birch. I think I did see a tree at the mouth of a hollow near Nieman's

house, with two R's cut on it—old marks—upwards of twenty-eight years ago.

James Burchfield sworn.   I saw a tree marked with two R's on it upwards of thirty years ago, very old at that time; near that I did see the remains of a small building at the mouth of a deep hollow, where the large bottom is.   My father lived about two miles above Auker's saw-mill, and knew of a line called Ramsey's line, running into my father's field: a white oak corner stood in a field that my father owned as long as I lived in the country; it was called Ramsey's; they now call it Pringle's survey.   There was a line running east from it towards the creek, well marked, and an old line; this is above some distance the big bottom I spoke of; it is between a quarter and a half mile above the bottom and improvement I spoke of; it looked about the size of a hunter's cabin, along the line running N. 15° E. 97.   I saw blazes, apparently a line running down to the hollow and up the point of the hill, all thirty years ago; and they looked old then; they were about the same age probably of the two R's on the trees.

The Court below thus charged the jury:

The present action of ejectment is brought for the recovery of 300 acres of land in Greenwood township in this county : defence is only taken for 169 acres and 62 perches.   And our inquiries are directed to that portion of the case and no further.   The plaintiff has shown a regular warrant, survey and patent for the land in dispute; this would give him a perfect legal title, and entitle him to your verdict, unless the defendant has shown some evidence that could authorize the conclusion of the court and jury that a better title is outstanding, either in the defendant himself, or some other person.   It is true, a plaintiff in ejectment must recover on the strength of his own title, and not on the weakness of the defendant's.   It is all important that neither of us should be carried away by the appeals of counsel, or sympathy for the parties; but take up the whole evidence in the case, and upon it render a verdict.

The plaintiff, I have before stated, has shown a legal title to the property; what has the defendant shown to defeat it? what is the evidence in the cause? as by that alone you are bound, we are not to conjecture, nor presume, in the absence of any proof, that all the counsel seem disposed to urge, is to be taken for granted by you, and a verdict rendered accordingly.   We must settle the rights of parties in the legal way, as near as we can reach it by legitimate testimony.

The defendant has shown a warrant to Robert Ramsey for one hundred and fifty acres of land on the north branch of the Cockalamus creek, dated 3d June 1774, and a survey upon that warrant, regularly returned into the land office, 26th May 1784. That this warrant issued, and a survey upon it, we can have no doubt; but where the precise location of it is, we are not so

[Nieman v. Ward.]

clearly informed. And for the purpose of showing that the land in dispute is in reality the Robert Ramsey survey, they have shown subsequent warrants to other persons, and surveys upon them, calling for Robert Ramsey's survey; this, in law, is not sufficient to constitute it one. A survey must have been made upon the ground, to render it effectual. Now, was there an actual survey made on the ground in dispute on the Robert Ramsey warrant? What is the proof? it must come from the parties alleging it. John Jones swears positively, that twenty-eight or thirty years ago, old Mr P. Law, a surveyor, Esquire M'Knight and himself, went on this very land and searched for the lines upon the ground; and the result of their search was, that they could not find one single line, tree, or corner, except the birch spoken of. William M'Allister was there in 1815, and he could not find any evidence of any mark, either lines or corners. Now, this testimony, as far as we are able to judge, so far from proving a survey upon this ground, proves the very reverse, that there never was one made on that ground on the Ramsey warrant. The other witnesses do not pretend to prove an actual survey. Webster proves that Marks, the warrantee of plaintiff, showed him what was called the Ramsey land, and wanted to buy his right. This by no means proves of itself, that it was the land actually surveyed on the Ramsey warrant; but to give it full force, it only shows he thought it was. Heiser also proves that he thought the Ramsey survey was there. The opinion of a portion of the neighbourhood that a tract of wild uncultivated land in the woods lies in a particular place, does not actually locate it there. It must have been surveyed, and appropriated by that survey to the particular warrant on which it was made. David Reed says he saw a white-oak corner, when he was once hunting, but knows nothing of its age or date; and says positively he never knew a line of the Ramsey survey. James Burchfield saw a tree marked with two R's, upwards of thirty years ago, and an old line running down the hollow and up the side of the hill. But if I recollect M'Allister's testimony, who was a surveyor, he also states, that he found a great deal of blazing, but it did not satisfy him that it was the old survey; and says that he made every reasonable search for the lines of the Ramsey survey on this land, and could not find them. Now, if this testimony is believed, the defendant is mistaken in supposing that the survey was actually made on the land in dispute. The location of this ground, in our opinion, under the facts, is not such as would be likely to lose every line, tree, and corner on the whole survey, so that none could be found thirty years ago, nor since. It seems that the whole was wood, up till the defendant went there in 1838 with his family, after the plaintiff had located his warrant—and after he must have known the plaintiff's right had attached, and if he remained, he must meet a lawsuit.

I. — 10                    G

[Nieman v. Ward.]

It is, however, a question of fact for you to determine, whether a survey was ever made on the land in dispute on the Ramsey warrant. We will answer the points of law submitted to us, and leave the facts to be applied by you to them, as we shall state it.

Plaintiff's 1st point. "If the plaintiff's warrant and survey are of an earlier date than the occupancy of the land by the defendant, in the absence of any other title the plaintiff is entitled to recover."

Answered in the affirmative: but its application to the facts of the case is to be determined by you.

2d point. "Title to a third person, to defeat the plaintiff in ejectment, must be a *subsisting and available title on which the asserted owner might recover in ejectment.* If such title be barred by the statute of limitations, or by a descent cast, or by the death of all the parties in interest under it, the defendant cannot avail himself of it, so as to defeat the plaintiff's right to recover."

Answered in the affirmative. Its application, however, to the facts of this case is for you.

3d point. "Though the warrant and survey to Robert Ramsey call for the land in controversy; and a survey was made in 1774 and returned in 1784, embracing the land; if Robert Ramsey has not been known or heard of since, nor any heirs or representatives, or others claiming or holding under any of them, now, after the lapse of fifty-five years, the race is presumed to be extinct, and there is no such title in them or any of them, that can be used by the defendant, who is but an intruder, to defeat the plaintiff's right to recover."

I do not think so. The commonwealth can only reappropriate or sell its land to other purchasers, than those originally sold to, when the title has been revested by legal process of law. And if, as before intimated, the Ramsey warrant was actually located upon the land in dispute by an actual survey on the ground, the commonwealth could not, under the facts in this case, sell the land to another person and defeat an outstanding subsisting title, which Ramsey's would be, if you find the facts as before indicated. We, therefore, answer this point in the negative.

4th point. "Though the return of survey is evidence that a survey was made according to its import, it is not evidence *per se* that it includes the land in controversy; and it lies on the defendant to prove to the satisfaction of the jury that the survey on the ground did include the land now in dispute."

Answered in the affirmative.

5th point. "If the jury find, from the evidence, that the alleged Ramsey survey did not in fact embrace the land in question, there can be no such title under it in anybody, so as to defeat the plaintiff's right to recover."

Answered in the affirmative.

6th point. "That there is no title shown in Peter S. Nieman,

[Nieman v. Ward.]

the defendant, other than what may be inferred from his residence upon the land which the witnesses state commenced after the date of the plaintiff's warrant and survey. That the attempt to prove a holding by the defendant under the title alleged to have been in Robert Ramsey, altogether failed, and if the evidence of the witnesses is true, the title of the plaintiff is better than the title of the defendant."

This point is one of fact, and for the determination of the jury.

Defendant's first point. "If the jury believe the land in dispute to be the same that was surveyed and returned on the warrant in the name of Robert Ramsey, then they will find for the defendant."

Answered in the affirmative.

2d point. "That the calling of the adjoining surveys for the land of Robert Ramsey is such a designation of the land of Robert Ramsey without more, or lines marked upon the ground, particularly after a return of survey for more than fifty years; then in point of law the presumption is, that a survey was actually made, and the plaintiff cannot recover."

If the survey upon the Ramsey warrant ever had been made on the land in dispute, the facts indicated in this point would be sufficient to designate its boundaries after so great a lapse of time. But if there never was a survey upon this land on that warrant, its being called for by other warrants and surveys, marked near it in 1786, 1818, and 1823, of itself would not change the location of the survey actually made on the Ramsey warrant to the place in controversy; and from the evidence, we have no doubt there was one made somewhere, but whether on this land in dispute or not, is the principal fact for your determination in the present controversy; with this qualification, I answer this point in the affirmative.

3d point. "That the plaintiff must recover on the strength of his own title; and if there is an outstanding title in any one, who has paid the commonwealth for it, then the plaintiff cannot recover."

The plaintiff must recover on the strength of his own title, and if there is an outstanding subsisting title in another person, and shown to your satisfaction, who has paid the commonwealth for it, the plaintiff is not entitled to your verdict.

4th point. "That the commonwealth having been satisfied by Ramsey, there cannot in point of law be any abandonment in favour of the commonwealth, which will in law authorize her to sell the same land again to any one; therefore the plaintiff cannot recover."

Answered in the affirmative, except the part, "plaintiff cannot recover," which we do not say to you.

5th point. "The court are requested to instruct the jury, that after a lapse of twenty-one years from the return of survey made

by a proper officer, the jury are to presume an actual survey to have been made."

Answered as a general proposition in the affirmative; but was the survey made originally on this tract? this is for you to determine.

The court cannot dismiss the case without again calling your attention to the real question for your consideration; and ask you to determine that question from the evidence in the cause. We must not entertain for one moment questions of hardship as pictured by counsel in the absence of testimony. In this case no such hardship has been shown; the defendant only entered on the land in 1838; and, as before indicated, after the plaintiff located his warrant. Now, is the land in dispute, the land surveyed on the Ramsey warrant? Has this been proved to your satisfaction? The court have no recollection of any testimony showing this fact to our satisfaction, but as the testimony strikes our mind, the very contrary *seems to be pretty fully made out,* that no *actual survey ever was made on the land in dispute* under the Ramsey warrant. We do not, however, wish you to take our opinions of the facts for yours. They are for your own consideration, not ours; and with you the court leave them.

Assignment of errors:

1st. The court erred in saying to the jury, " And for the purpose of showing the land in dispute is in reality the Robert Ramsey survey, they have shown subsequent warrants to other persons, and surveys upon them, calling for Robert Ramsey's survey. This in law is not sufficient to constitute it one: a survey must have been made on the ground, to render it effectual."

2d. The court erred in answering the second point of the plaintiff below in the affirmative.

3d. The court erred in the answer given to the 2d point of the defendant below; and in leaving to the jury, as a question of fact for them to determine, whether any survey had been made on the warrant to Robert Ramsey, of June 3d 1774, with a survey thereon of July 25th 1774, returned into the land office, May 26th 1784, and accepted; and in telling the jury that the issuing of warrants in 1786, 1818, and 1823, calling for the lines of the Robert Ramsey survey to be where the land in dispute in the present action is, did not fix the locality of the Robert Ramsey survey.

4th. The court erred in answering the fourth point of defendant below.

5th. The court erred in answering the 5th point of defendant below; and in leaving to the jury, to find as a question of fact, whether two warrants and surveys adjoin each other; where the younger warrant calls to adjoin the elder, and it is issued after a survey made and returned on the elder, and where a survey has been made and returned and accepted on the younger warrant, calling to adjoin the lines of the elder survey; the elder

[Nieman v. Ward.]

survey being sixty-five years old, and the marks of the lines not being found on the ground, the land yet being a forest.

*Mathers* and *Isaac Fisher*, for plaintiff in error.

The only point in the cause is, was the land in dispute appropriated to and surveyed upon the Robert Ramsey warrant? and the subject of the assignment of error is, that the court below undertook to decide the whole cause, although matter of fact, and that they decided it erroneously. The court said to the jury, " as the testimony strikes our mind, it seems to be pretty fully made out, that no actual survey ever was made on the land in dispute under the Ramsey warrant." We think that it was proved with great clearness that the survey was actually made on the ground, and did embrace the land in dispute. The warrant calls for " land on the north branch of the Cockalamus creek, on both sides of the creek, a little above John Jones's claim, including a large bottom, where Ramsey's improvement is." Now, the proof is clear that the land in dispute does lie on the north branch of the Cockalamus creek, and on both sides of it: that it is a little above John Jones's claim: and that it includes a large bottom, remarkable, because it is the largest on the creek. The witness Burchfield swears, that forty years ago, there was an old improvement, which was doubtless " where Ramsey's improvement is;" and, as it were to remove all doubt about the fact, several witnesses say, that the corner tree of the survey was marked with two R's; and if evidence can identify it more clearly, all the surveys adjoining it which have been made since, call for the Robert Ramsey survey; everybody, including the plaintiff himself, as appears by the testimony of Daniel Heiser, called it Ramsey's land, and yet the court tell the jury that they can see no evidence leading to the conclusion that this land was surveyed for Robert Ramsey. We contend, that the facts in evidence are not only such as should have been fairly submitted to the jury, but are conclusive against the plaintiff's claim, as matter of law. 2 *Watts* 230; 4 *Watts* 295; 5 *Watts* 223; 7 *Watts* 98; 4 *Watts* 261, 133; 6 *Binn.* 125; 12 *John.* 514.

*Parker* and *Reed* for defendant in error.

The whole cause was embraced within the question of fact whether a survey had been actually made on the ground upon the Ramsey warrant; and that fact the court left to the jury, by repeatedly instructing them that it was their province to decide it. The court may give their opinion to the jury upon the facts of the case, and if they be mistaken, it is not the subject of error. 4 *Rawle* 356; 7 *Serg. & Rawle* 237; 2 *Serg. & Rawle* 467; 2 *Penn. Rep.* 23; 8 *Watts* 311. But we contend that the defendant was a trespasser upon the land after the plaintiff's title originated. Ramsey's warrant was taken out in 1774; if surveyed at all, it

[Nieman v. Ward.]

was in 1775, and never afterwards was any act done in pursuance of it; it therefore became derelict, and was not a subsisting title in 1837, when the warrant was granted to Jacob Marks. 3 *Wheat.* 224. But even with this title, such as it is, the defendant showed no sort of connexion. He was a mere trespasser without title.

The opinion of the Court was delivered by

KENNEDY, J.—The great question presented on the trial of this cause in the court below was, whether the survey, made on the warrant in the name of Robert Ramsey, included the land in dispute or not. If it did, the plaintiff there had no right whatever to recover it from the defendant. On the contrary, if it did not, the title of the plaintiff being prior in date to the defendant's settlement on the land, and the only title shown from the commonwealth for it, entitled him to the recovery of it. A number of errors have been assigned, but the most of them relate to the instruction which was given by the court to the jury, either in their general charge, or in their answers to points submitted to them by the parties respectively, on the question whether the Ramsey survey included the land in dispute or not. And, excepting on this question, we think that the instruction of the court, and their answers given to the jury, on the points submitted by the parties, were right. But as regards it, we are of opinion that the court misled the jury, by presenting the evidence given, which tended to show that the survey, made in pursuance of Ramsey's warrant, embraced the land in controversy, under a different aspect from that in which the law requires that it should be viewed in the case of an ancient survey. Ramsey's survey having been shown to have been made in July 1774, in pursuance of a warrant granted to him by the commonwealth in the month of June preceding, must be regarded as an ancient survey. In 1784 it was returned into the surveyor general's office; and from that time down to 1837 the land in question seems to have been considered and denominated Ramsey's land by those living in the vicinity of it; and among the number who so considered it, was, as appears from the evidence, Jacob Marks himself, the warrantee under whom the plaintiff below now claims the land. From the date of the Ramsey survey, the length of time is three times more than sufficient to raise an absolute and conclusive presumption of law, which cannot be rebutted, that the survey was duly and regularly made by the artist's having gone on the ground and run and measured the lines of it. But after so great a lapse of time, it is not to be expected that witnesses, who were present at the making of the survey, can be produced to prove its actual location on the ground. Nor ought it to be considered at all extraordinary, that in such a case as the present, no positive and direct testimony has been given by the defendant below of marks having been actually made by the surveyor on the ground at the time of

his making the survey in 1774. The return of the survey made into the surveyor general's office, and a lapse of twenty-one years afterwards, without any attempt being made during that interim to contravene or take exception to it, is conclusive evidence that it was regularly made. And after so great a length of time as ran around in this case, say sixty-four years, circumstantial evidence, tending to show the probability that the survey made under Ramsey's warrant covered the land in dispute, was sufficient, unless repelled by evidence showing the location of it on other land, and was all that ought to have been required. Now, did not the evidence given on the part of the defendant below show this? In the first place, it would seem from it that the land in dispute answers, with reasonable certainty, to the land called for by the description contained in the Ramsey warrant. It lies on the north branch of the Cockalamus creek, and on both sides of the creek, as mentioned in the warrant. It also lies above Jones's claim, and includes a large bottom, according to the call of the warrant, on which the defendant has his dwelling-house and resides with his family. And near to this were seen, some thirty years ago, as testified to by two witnesses, the remains of an ancient small house, which would seem to correspond with Ramsey's improvement called for in the warrant.

In addition to the evidence given, tending to prove all these facts, Mr M'Allister, a surveyor, who made some of the surveys in the neighbourhood of the land in dispute, and adjoining to it, testified that it was called Ramsey's land for many years back, and that the draft of the survey made and returned in pursuance of Ramsey's warrant suited the land in dispute; that the waters were correctly laid down on it, and further, that he found a birch tree, a corner, as he supposed or presumed, of the Ramsey survey, but was not certain that it was the same; though it is evident that he thought it was. Other witnesses also testified that upwards of thirty years before the trial of the cause, they saw the letter R marked twice on a tree near the remains of the ancient house; which they also spoke of as the initials of a person's name, which would answer to the name of Robert Ramsey, the warrantee; and had, as they said, the appearance of having been made many years before they first saw it. According to the evidence, it also appeared that the land in dispute had for many years been considered as Ramsey's land, and was so regarded not only by the neighbours around, but likewise by the deputy surveyors in their locating warrants of subsequent date to Ramsey's warrant, by avoiding it so as not to include any part of it, and by calling for it as a boundary in the surveys made by them on the adjoining lands. And although some portion of this evidence was mere reputation or hearsay, yet such evidence is entitled to respect in cases of boundary, where the lapse of time is so great as to render it difficult, if not impossible, to prove the boundaries

by the existence of the primitive land-marks, or other evidence than that of hearsay. And in the present case, taking it in connexion with the other evidence referred to, after a lapse of more than ·sixty-four years, it was powerful evidence to show that the Ramsey warrant had been located by a survey upon the land in dispute, as no evidence was given, which went to repel it, by showing the slightest degree of probability that it was located elsewhere. But the court below, instead of instructing the jury to this effect, told them that the defendant, " for the purpose of showing that the land in dispute was in reality the Robert Ramsey survey, had shown subsequent warrants to other persons and surveys upon them, calling for Robert Ramsey's survey. This in law was not sufficient to constitute one. A survey must have been made upon the ground, to render it effectual. Now, was there an actual survey made on the ground in dispute on the Robert Ramsey warrant? What is the proof? It must come from the party alleging it. John Jones swears positively that twenty-five or thirty years ago old Mr P. Law, a surveyor, Esq. M'Knight and himself went on this very land, and searched for the lines upon the ground, and the result was that they could not find one single line, tree, or corner except the birch spoken of. Mr M'Allister was there in 1815, and he could not find any evidence of any marks, either lines or corners. *Now this testimony, as far as we are able to judge, so far from proving a survey made upon this ground, proves the very reverse; that there never was one mark made on the ground on the Ramsey warrant.* The other witnesses do not pretend to prove an actual survey. Webster proves that Marks, the warrantee of the plaintiff, showed him what was called the Ramsey line, and wanted to buy his right. This by no means proves of itself that it was the land actually surveyed on the Ramsey warrant; but to give it full force, it only proves that he thought it was. Heiser also proves that he thought the Ramsey survey was there. The opinion of a portion of the neighbourhood, that a tract of wild uncultivated land in the woods lies in a particular place, does not actually locate it there. It must have been surveyed and appropriated by that survey to the particular warrant on which it was made. David Reed says he saw a white oak corner, or a tree that he supposed to be a corner, when he was once hunting, but knows nothing of its age or date, and says positively he never knew a line of the Ramsey survey. James Burchfield saw a tree marked with two R's, upwards of thirty years ago, and an old line running down the hollow, and up the side of the hill. But if I recollect M'Allister's testimony, who was a surveyor, he also states, that he found a great deal of blazing, but it did not satisfy him that it was the old survey; and says that he made every reasonable search for the lines of the Ramsey survey on this land, and could not find them. Now, if this testimony be believed by you, it does seem to me that the

defendant is mistaken in supposing that the survey was made on the land in dispute. The location of this grant, in our opinion, under the facts, is not such as would be likely to lose every line, tree and corner on the survey, so that none could be found thirty years ago, nor since. It seems that the whole was woods up until the defendant went there in 1838, with his family, after the plaintiff had located his warrant, and he must have known the plaintiff's right had attached, and if he remained he must meet a lawsuit." And in the conclusion of the charge, the court, after putting the questions again to the jury, " Has the land in dispute been surveyed on the Ramsey warrant? Has this been proved to your satisfaction," say, " the court have no recollection of any testimony showing this fact to our satisfaction; but as the testimony strikes our mind, the very contrary seems to be pretty fully made out, *that no actual survey ever was made on the ground in dispute under the Ramsey warrant.*" From the charge of the court thus delivered to the jury, it will be perceived that each circumstance, for instance, the subsequent warrants and surveys made thereon, calling for the land in dispute as the Ramsey survey, was presented singly to the jury, with the advice of the court, that it did not *constitute* a survey. Now, although this was true, yet each circumstance treated in this way by the court, was at least some *evidence* that the land in dispute was *included* within the survey under Ramsey's warrant, which was *conclusively proved to have been made by the return thereof made into the surveyor general's office in March* 1784. And again, although each circumstance or fact taken singly might be very slight evidence, and wholly insufficient to produce a conviction in the minds of the jury, that the survey of Ramsey was made on the ground in dispute, yet when taken collectively with all the other circumstances and facts given in evidence, it might be very sufficient to satisfy the jury beyond all reasonable doubt that the survey was so located. Indeed, the birch corner, of which Jones speaks, and says he saw on the ground thirty years ago, if believed to be a corner of the Ramsey survey, would of itself furnish a beginning point, from which, by the aid of the compass and chain, with a copy of the draft of the survey, the lines thereof could be easily found on the ground, though no other mark should ever have been made on them; and the survey would nevertheless be good. The testimony of Jones, in regard to this birch being a corner of the Ramsey survey, was fortified by the testimony of Mr M'Allister, an artist, who says he found a birch corner, which he *supposes* or *presumes* was a corner of the Ramsey survey, but is not certain that it was so. But such, from what he says, is undoubtedly his belief; and being an artist, his belief, though not firmly fixed on the matter, ought to have weight. And here it may be remarked, that the court below seem to have overlooked this part of Mr

I. — 11

M'Allister's testimony altogether, though important, for they have not mentioned it in their charge, but rather notice his evidence as if he had testified to nothing of the kind, but on the contrary had testified that, in his opinion, he could not, after a diligent search, discover a single trace or mark of a survey having been made under the Ramsey warrant on the ground in dispute. The language of the court, as to this, is " William M'Allister was there in 1815, and he could not find any evidence of any marks, either lines or *corners*." But the testimony of Mr M'Allister is, " That first *birch* I *supposed* to be a corner, but don't know that it is the same birch on the land of the defendant. I *presume* it is the *same*, but *am not certain*." The court also leave out of view the evidence showing that the land called for and described in the warrant, corresponds with reasonable certainty to the land in dispute, and, in short, would not seem to suit any other so well; for although in some respects other land near to the land in dispute might suit the calls of the warrant, yet the land in dispute is the only land which seems to meet the description contained in the warrant in every particular; for instance, it is the only land there suiting the calls of the warrant in other respects, upon which any thing like the ancient improvement mentioned in the warrant has ever been seen. According to the evidence, the waters as laid down upon the draft of the Ramsey survey, agree with the waters as found upon the land in dispute. This circumstance, as also others, though of weight, where the question. as to the location of the survey might otherwise be doubtful, seems to have escaped the notice of the court altogether. Seeing the court undertook to refer, in their charge to the jury, to some of the evidence and the circumstances testified to by the witnesses, in relation to the question whether the Ramsey warrant was laid on the land in dispute or not, it would have been right, in order to prevent the jury from being misled, to have brought every thing to their notice which had any bearing upon that question; and to have instructed the jury that they were to decide it, not by taking each circumstance singly into consideration, as they seem to have done in regard to those which they have noticed, and say whether it of itself, excluding all the rest from their view, was sufficient to settle the question the one way or the other; but, by taking all into their consideration at once, and under a combined view of the whole, giving to each circumstance its due weight in connexion with the others, make up their decision on the question. If this had been done, it is not easy to perceive how the jury could have come to any other conclusion on the question, than that the land in dispute was included in the Ramsey survey; for all the evidence given tending to show the location of this survey, pointed to this land, and no other. And, in truth, if the land in dispute cannot be held under the Ramsey warrant, it would seem, from the evidence, to be very clear that no other can. But that the

owner of the Ramsey warrant ought to have the land surveyed under it cannot be doubted; and if it be shown with probable certainty that the land in dispute is the same, the defendant below ought to be protected in his possession until called on to give it up to the owner of the Ramsey warrant.

Judgment reversed, and a *venire facias de novo* awarded.