## Collins v. Barclay.

After a survey has been returned fifty years, and taxes have been paid for upwards of thirty years, the presumption that the survey was regularly made, is *de jure*. And it seems this presumption applies where the survey has been returned for more than twenty-one years.

Nor is it material that there has been a subsequent decree of the board of property on a caveat to this return, directing a different survey, there being no evidence of acts done according to the decree.

Evidence of ancient practice of surveyors not admissible to rebut this presumption.

Evidence of location of adjoining tracts always admissible, to show location of survey calling for them.

Payment of taxes, after a treasurer's sale for them, has no effect on the title.

If a particular piece of land is taxed, and sold for non-payment, it is immaterial who was the owner.

In error from the Common Pleas of Cambria.

*Oct.* 20. Ejectment for a moiety of a tract surveyed to Bethel. The plaintiff showed a warrant to Bethel, in 1794, a survey returned in the same year, and a patent in 1796. Also the assessment of taxes from 1808, and a treasurer's sale in 1822 for the taxes of

1820 and 1821, to plaintiff and another: all the taxes, excepting for these ten years, had been regularly paid. He further showed a connected draft of surveys under fifty-two warrants, including Bethels, the leading warrant being Turner's, which called for certain adjoining tracts, of the position of which he gave some evidence.

The defendants showed, that in 1795, a caveat was filed against the acceptance of these surveys, and by consent a decree made by the board of property, that the returns should be made agreeably to an agreement of the parties, which is to be found in the opinion of this court. There was then before the board a draft of the surveys according to the intended agreement; but that was not produced, nor was there evidence of what was done under the decree.

It was in evidence, that the interior lines of the connected survey of the fifty-two warrants could not be found; but there was some evidence showing the position of one of the exterior lines, and of the position of adjoining tracts, and that a survey, according to the return of the Bethel warrant, would include the land in dispute.

. The defendant also offered the treasurer's book to show payment made in 1823 and 1824, of the taxes for 1821 and 1822, which were rejected, being made after the sale.

His honour, WHITE, P. J., instructed the jury, that after a lapse of more than twenty-one years from the return of the survey, which had been accepted, and the tract recognised by assessment and payment of taxes, it was not necessary to show a survey actually made on the ground; for the law would presume a survey correctly made, the decree of the board of property making no difference in that respect; and if the land in dispute was actually within the lines, as they could be ascertained from the return, or from protracting the mathematical lines of all the tracts, and then going on the land and marking them off, dividing the surplus or excess within the outer lines of the connected survey among them, then the tax sale passed the title, no matter who might be the owner. The exceptions to evidence are stated in the opinion of this court. .

The charge of the court, that the existence of interior lines need not be shown, or those of the exterior lines, if the land could be otherwise identified, and with respect to the effect of the decision of the board of property, and the admission and rejection of evidence, were the errors assigned.

*Foster* and *Magehan*, for plaintiffs in error, cited 5 Watts, 194; French *v.* Seely, 6 Watts, 292; McKeehan *v.* Commonwealth,.

3 Barr, 151; Woods v. Ingersoll, 1 Binn. 146; Browne v. Arbunkle, 1 Wash. C. C. Rep. 484; Morris v. Travis, 7 Serg. & Rawle, 220; Caul v. Spring, 2 Watts, 390; 4 Wash. C. C. Rep. 171; McKelry v. Gilleland, 3 Watts, 312; Orr v. Cunningham, 4 Watts & Serg. 294; Dougherty v. Dickey, Ibid. 146.

*Banks* and *Cox*, contrà, cited Strauch v. Shoemaker, 1 Watts & Serg. 175; McCoy v. Michew, 7 Watts & Serg. 386; Taylor v. Dougherty, 1 Watts & Serg. 324; Kelsey v. Murray, 9 Watts, 111; Griffith v. Bradshaw, 4 Wash. C. C. Rep. 171; Caul v. Spring, 2 Watts, 390; Goddard v. Gloninger, 5 Watts, 209; Nieman v. Ward, 1 Watts & Serg. 68; Norris v. Hamilton, 7 Watts, 91; Read v. Goodyear et al., 17 Serg. & Rawle, 351.

*Dec.* 10. BURNSIDE, J.—The sixth, seventh, eighth, and ninth errors assigned, raise the consideration of all the material questions in this important case. They bring into view the whole title of the plaintiff below, and the instruction of the Common Pleas. upon the various objections to that title. In the first place, the plaintiff gave in evidence a warrant to Samuel Bethel for four hundred acres, of the 28th of January, 1794, adjoining John Vanost on the south. A survey of the 25th of August, 1794, of four hundred and thirty-three acres, one hundred and fifty-three perches, by John Canan, deputy-surveyor, then Huntingdon county; 25th of February, 1796, patent to William Barton, Esq.; valuation and assessments of county and road taxes on Samuel Bethel, in 1821; a sale by the treasurer on the 30th December, 1822, and deed acknowledged in open court, on the day following, to the plaintiff and William Bayard.

The defendants, for the purpose of destroying this title, gave in evidence, from the land-office, a copy of the original application for fifty-two tracts, dated 24th of January, 1794, which includes Samuel Bethel, commencing with Daniel Turner, the leading application, which was for four hundred acres on the easterly branch of Clearfield creek, in the county of Huntingdon, township of Frankstron, north-west of Allegheny mountain, beginning at the north-east corner of William Holliday's tract of land, adjoining the proprietaries' Manor tract; thence from said Holliday's corner north, by a line of marked trees, three hundred and twenty perches to the place of beginning, thence west two hundred and thirty perches. Also a caveat, entered in 1794, by Isaac Richardson and Alexander Norris, against the acceptance of any survey or surveys,

or the issuing of any patent or patents to any person or persons, in pursuance of the following lists of warrants, setting out the names of the warrants, amounting to upwards of five hundred, and including the fifty-two warrants of which the application was before given in evidence. The board of property met on the 20th of April, 1795; all the owners or claimants of the warrants, appeared, viz., Daniel Turner, William Barton, John Barron, Charles Dilworth, Andrew Norney, John Brown, Alexander Jackson, Isaac Richardson, and John Patton, when they exhibited to the board an agreement under their hands and seals, made in Philadelphia on the 6th of April preceding that: "Whereas, the said parties are claimants of, and have warrants for lands described in and by the general draft, made by the aforesaid Daniel Turner, lying in Huntingdon county, which said draft is now before them, and being desirous for the mutual accommodation of all the said parties to settle and compromise with each other, on fair and equitable principles, all matters of disagreement and misunderstanding concerning their respective claims under their several warrants, in order that all controversies relative thereto, by or between the said parties, may for ever hereafter be prevented and removed, they, the said parties, do, by these presents, mutually agree to and with each other, as follows, that is to say:

"1. That the warrants of survey belonging to Messrs. John Hannum and Charles Dilworth, in the hands of John Canan, Esq., or Mr. Patrick Cassiday, are to begin at a Spanish oak, being a corner from which a line extends, south eighty-four degrees west, two hundred and forty-five perches, and another line running north twenty-seven degrees west, two hundred and fifty-two perches, being two of the lines of survey known by the name of Hanum and Dilworth, in the county of Huntingdon, and to extend from thence to the fifth corner in a line of south sixty degrees west, in the said Daniel Turner's draft, (being Chestnut Oak,) and thence extending along a line of said Daniel Turner's draft, south thirty degrees east, and continuing that course, until it strikes the Lowdon land. And the said Charles Dilworth, on behalf of the aforesaid John Hanum and himself, and of all persons claiming or to claim by, from, or under them, or either of them, quits claim to all other lands included or described in the aforesaid draft, lying to the northward or north-eastward of the before-mentioned line, running the course of south thirty degrees east.

"2. That the surveys made, or to be made, for the before-mentioned parties to these presents, as the same are laid down in the

general draft aforesaid for the other parties herein named, shall be and remain as they are herein laid down and described, the same being designated as follows, to wit: the aforesaid Isaac Richardson, on behalf of himself and those interested with him, shall begin at the main fork of Sinking branch of Juniata, and comprehending one hundred and seventeen tracts, numbered from No. 1 to No. 117, both inclusive, as the same are designated in the aforesaid draft.

" 3. That the aforesaid (General) John Patton, on behalf of himself and those concerned or interested with him, shall begin with the tract marked in the aforesaid draft, P. No. 1, on the southerly side of the aforesaid Isaac Richardson's tract, numbered 36, and comprehending one hundred and three tracts, numbered from No. 1 to No. 103, inclusive, and all marked P., the last adjoining Aaron Tery's land.

" 4. That the aforesaid William Barton, on behalf of himself and those concerned or interested with him, shall begin at No. 1, marked B., on the southerly side of General Patton's tract, marked P., No. 1, and comprehending fifty tracts, numbered from 1 to 50, both inclusive, all marked B., and the last adjoining Boynton and Wharton's land.

" 5. That the said William Barton, on behalf of himself and those concerned or interested with him, shall also have the seventy-seven tracts, which, in the aforesaid draft, are bounded on the southward and eastward by land of Isaac Richardson & Co., as before designated on the northward of old surveys, and on the westward by Hanum and Dilworth's and old surveys.

" 6, and lastly. It is further concluded and agreed by and between all the parties before mentioned, that the several articles hereinbefore contained and expressed, shall be obligatory on all the parties before mentioned, and shall have their full effect as soon as the honourable board of property shall have adopted and confirmed the terms of this agreement.

" And it is further agreed, by and between the said parties, that the aforesaid John Brown shall have fifteen tracts, as marked in the name of Brown in a general draft made by M. Samborne, the leading warrant of said Brown to begin on the north-east side of Luke Maguire's tract, and to extend south and south-west, adjoining lands as mentioned in the said general drafts, to be returned by the deputy-surveyor, upon the warrants of said Brown, dated the 7th day of March, 1794; and the said Brown doth, on his part, and on behalf of those concerned with him, for ever quit claim to all lands adjoining the said fifteen tracts lying north and easterly

and south, which are included in the lands claimed by the parties aforesaid."

The board confirmed the same, and the deputy-surveyor was directed to make return of the surveys of the parties conformably to their agreement. All the warrants of the parties were laid down on Turner's draft, who was at that time well known to be an assistant of Col. Canan. I do not mean to say he had a written appointment, for such written deputations were not common at that day; but he made numerous surveys, and Col. Canan returned them to the land-office. So, in this case, no regard was paid to the calls of the warrants, for that would have made them interfere with each other; nor to the agreement; but the returns were generally, if not altogether, made by Turner's draft. The owners of this large body of warrants never complained. Those returns were received, and have remained accepted in the land-office for more than half a century; and whether there was a subsequent agreement of the parties changing their former arrangement before the board of property, is at this distance of time immaterial. The tract in question, as well as the lands in general, have been long since patented. The original owners have all paid the debt of nature; neither their representatives nor any subsequent intruder will be allowed to disturb those returns. In 1794, the mountain, and both sides of it, was a wilderness, and the points and descriptions in warrants and agreement were liable to great mistakes and inaccuracies. Where the country was all vacant, and numerous warrants were issued, so as to cover a very extensive territory, but little attention was paid to the leading warrant; nor was this material, as there were but few, if any, settlers who had rights that could be interfered with. The great object of the surveyors was to keep from interfering with each other, in which they were not always successful. Where the warrant was removed, it gave title from its return and acceptance into the office. The law has ever been held that, after a survey has been returned into the office, the authority of the deputy-surveyor is at an end; the lines cannot be altered or extended without a new order of survey: 3 Yeates, 401; 2 Binn. 37, 55. Another ground urged by the plaintiff in error, is that there was no actual survey made on the warrant of Samuel Bethel. This warrant was one of the fifty-two applications of Barton, and patented in 1796, since recognised by the township and county officers for more than twenty-one years. These fifty-two tracts were returned as adjoining each other in one body, and called for other surveys of about the same date, and all those adjoining sur-

veys were given in evidence with their warrants by one party or the other. The whole fifty-two tracts were located and fixed by adjoining bodies of surveys : on the north the Lowdon & Co. ; north-east Capt. Rickets, now McMurtrie ; Richardson & Co., now Morgan and others ; by the latter round to the south-east, and some surveys of Phillips located in the angle formed by the Richardson & Co. surveys. Samuel Bethel and every other survey of the fifty-two tracts are as easily designated on the ground as if every line had been actually run and marked on the ground. It was never held essential to the validity of a body of surveys that the lines of each tract should be marked on the ground : 1 Binn. 146. The law has only required the surveyor to run sufficient to identify the lands returned. Where a new survey is made calling for an old survey, it is improper to mark the trees anew, as the double marks create confusion : Covert *v.* Irwin, 3 Serg. & Rawle, 283. Experience has shown the impropriety of the new survey being marked on the old line, because it has often occurred that the new marks have, with a fraudulent design, been made on the top of the old ones, the object being to destroy the old survey. More than one case of this kind is within my experience. In Lambourn *v.* Hartswick, 13 Serg. & Rawle, 121, the plaintiff recovered on the survey of T. West, jun., and there was no pretence of a single mark or line ever having been made on that survey. West's was a survey of 1785. Richard Tur had made a survey of 1766, but never returned it, and on that line and the outlines of Col. Miles's batch of surveys given in evidence all the warrants and several drafts, and having proved at least a line run where the surveys commenced, were covered. It was in Lambourn *v.* Hartswick that Mr. Justice Duncan first broached the doctrine that, where a survey has been returned twenty-one years, the owner paid the taxes, it was worthy of all consideration whether it ought not to be a presumption of law conclusive of the fact that the title was legal and perfect. The very point came before the court in Nieman *v.* Ward, 1 Watts & Serg. 68, where the court ruled, on great deliberation, that a return of survey into the surveyor-general's office and a lapse of twenty-one years afterwards, without any attempt made during that time to except or object to it, such return is conclusive evidence that it was regularly made. This doctrine is analogous to the statute of limitations, and is too well settled now to be shaken. The judge, who presided in the Common Pleas, left the question of fact fairly to the jury to determine whether the plaintiff's survey was returned on the land on which

the defendants had intruded, and this was all the defendants had a right to ask. I am not aware of any objection to the title derived from the tax sale; the law being settled that, where unseated land is sold for taxes, the title of the real owner, whatever it may be, passes to the purchaser: 1 Watts & Serg. 166. It is the identical spot of ground assessed that passes, without regard to the name or title used in the assessment.

The bills of exceptions to evidence remain only to be considered.

1 and 2. The offers in papers marked C and D were clearly evidence to fix the location and place described in the plaintiff's survey. To show the boundaries of the fifty-two tracts, all the adjoining surveys were evidence to go to the jury. In every day's practice, such evidence is received, and no sound land lawyer thinks of objecting to it.

3 and 4. The offer of the evidence of Mageehan and Cassiday was clearly irrelevant to the issue trying. Its truth was of no importance to the defendants. It only tended to raise a false issue before the jury, contrary to principles well settled, that surveys being returned to the land-office were not to be shaken or disturbed by the practice of surveyors in ancient times in running lines of reference, or making lines of exploration. There would be no safety if modern intruders were allowed, by such evidence, to disturb surveys returned to the land-office for more than half a century, being acknowledged and recognised by township and county officers and taxes paid for many years. Both the offers were, on every principle, properly rejected.

5. The sale for taxes, deed, and acknowledgment, in open court, was in 1822, for taxes assessed and unpaid for the preceding year. The fact that Mulhollan paid taxes in 1823 for the land which had been sold and conveyed by the treasurer, and the price paid by the purchaser, was perfectly immaterial. If such evidence was allowed, a treasurer could destroy his solemn acts duly authorized by him at his pleasure; all our treasurer's sales since 1815 would be, as they had been held before, a mere mockery that vested no title.

Judgment affirmed.