## The Pennsylvania Railroad Co. *versus* Berry.

1. A carrier may bind himself to transport goods beyond his own route and thus become responsible for the default of those he employs to carry the remainder of the distance; but the proof of the contract should be clear, especially when it would contradict the papers accompanying the transaction.
2. Where the charge as a whole tends to mislead the jury it is error.
3. A charge which misleads differs from a mere omission to instruct.
4. Wheeler *v.* Winn, 3 P. F. Smith 122, approved.

March 28th 1871. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Error to the Court of Common Pleas of *Warren county:* Of January Term 1871.

[Pennsylvania Railroad Co. *v.* Berry.]

E. H. Berry brought an action of assumpsit against The Pennsylvania Railroad Company (which is lessee of the Philadelphia and Erie Railroad), for the loss of household goods stolen from a car in which they had been placed for transportation from the town of Warren to Tidioute.

The writ was issued November 20th 1868, and the case was tried, September 13th 1870, before Johnson, P. J.

The goods lost, with their value, as testified to by plaintiff's witnesses, were as follows :—

| | |
|---|---:|
| Cask of China . . . . . | $125.00 |
| Box of Books and Pictures . . . | 100.00 |
| Table, $5; 5 Cane Chairs, $1.50 each . | 12.50 |
| 3 Hair Cloth Chairs, $6 each . . . | 18.00 |
| 1 Green reps. Greenland serges . . | 10.00 |
| 3 Kitchen Chairs, $1 each . . . | 3.00 |

The goods had to be transported on the Philadelphia and Erie Railroad to Irvineton, thence on Oil Creek and Allegheny Valley Railroad to Tidioute.

The plaintiff testified that on April 1st 1868, he made a contract with Gemmil, the agent of the defendants, to transport his goods to Tidioute without change of cars, and selected a car of proper gauge to go on the other road; the goods to be charged more on that account. On the 3d of April the car was at Irvineton; on the 4th, Saturday noon, it was at Tidioute; he paid charges there, but could not unload that day; the clerk and plaintiff looked into the car, all was dry and right. On Monday he again deferred unloading. On Tuesday he unloaded, and worked till night without taking out all the goods; locked the car and left. On Wednesday he missed the articles mentioned in the list: on that morning nothing appeared to be disturbed. On Saturday he saw the box of books, dining-table and box of bedding in the car, but did not see the cask of china. He gave other evidence of the loading of the goods and their value. Gemmil, the agent of defendants, testified that the plaintiff wanted a car to go through and not require the goods to be transferred; witness got him one loaded. On cross-examination he said he gave a receipt to Waid, whom the plaintiff had employed to haul the goods to the car, and took a release from Waid. The defendants had business arrangements with the other company, to run to and over their road, and collect track freights; the arrangement was, if there was one car only used, the freighter was to pay car service; the plaintiff wanted a car that would save the transfer of the goods. Witness made no arrangement that the defendants should carry the goods to Tidioute.

The defendants gave in evidence Waid's release to defendants for a " lot of H. H. goods from Warren station to Irvineton, consigned to E. H. Berry, Tidioute," and to all other companies over

18 P. F. SMITH—18

whose line the goods should pass, from damage from leakage, decay, chafing, breakage, damage by fire or from any other cause not the result of the collision of trains or of the cars being thrown off the track.    This contract to be executed by shippers of light furniture, household or miscellaneous goods.

The manifest was dated April 3d 1868, viz. :

" Merchandise forwarded from Warren to Irvineton ;" " Marks ; Tidioute, Pa."—" Consignee ; E. H. Berry"—" Description ; lot of H. H. goods (released)"—" Amount of freight $7"—Expenses $1"—" To be collected $8."

The manifest went with the goods and car.

The receipt stated that " as/ part of the consideration of the contract," the defendant should not be responsible (amongst other things), for theft nor in any event for more than $50 ; when goods are intrusted to any other company, that company shall be regarded exclusively as the agent of the owner and alone liable. The responsibility of the company to commence with the shipment and terminate with unloading the car.    The receipt attached was as follows :—

" Received of E. H. Berry the following, contents and conditions unknown, to be carried and delivered upon the terms, and according to the agreement above specified, at the Irvineton station of the above railroad.

| Marks. | No. and Alleged Contents. |
| --- | --- |
| E. H. Berry, | Lot H. H. Goods. |
| Tidioute. | Released." |

The defendant further gave evidence that the car and goods arrived at Irvineton between 10 and 11 o'clock A. M., of April 3d, and the car was transferred to the other road about 2 P. M. of the same day.    Also, that when the plaintiff came to see about the goods he was told they would have to be rehandled and transferred unless he was willing to pay car service, and to that he agreed ; the car was loaded nearly full between the doors, the chairs being on top.    Plaintiff looked at the car at Tidioute on Monday, there was no reason why he might not have taken them that day.

The plaintiffs points were :—

1. Whether the defendant did or did not contract to deliver the goods in suit at Tidioute, they are responsible for any loss occurring while the goods were in their custody, and the goods having been received by defendants and lost, they can only exempt themselves from liability by showing to the satisfaction of the jury that the loss occurred after their custody had ceased.

2. The defendants having received the plaintiff's goods and the same being lost, the presumption of law, in the absence of proof

to the contrary, is that they were lost through the default of the defendants.

The court after referring to the facts said : * * *

" Now, from this state of facts, the plaintiff asks you to say that the defendant entered into a special contract with him to transport these goods to Tidioute and is therefore liable to him for the larceny committed upon them during their transit.

" In addition to the evidence mentioned, it was also shown and not denied that these two roads were connecting roads and had business arrangements by which freight was received at any point on the one to be transported to any point on the other, with and without change of cars, and that in such cases, as in this one, the charges are not to be paid to the several roads over which the goods pass in their transit, but paid in gross at either end of the route to either, each road charging the other for the amounts so received.

" Inasmuch as this transaction was not put in writing, it is for you to say whether the Pennsylvania Railroad Company did undertake by contract, express or implied, to transport the plaintiff's goods to Tidioute or only to Irvineton.   The agent here distinctly disavows the intention of making any contract that would bind his principal, the defendant, further than Irvineton for the safety of the goods.

" If the transaction was such as to create an obligation on the defendant to carry the goods to their destination, either by its own motive power or that of another, then it would be liable for losses occurring as this one did.

" It is not questioned but that the agent here had power so to contract and bind the company, and we say he had the power.

" Did he, by contract express or implied in the peculiar character of this transaction, so engage ?   It was out of the usual course of business.   The usual bill of lading itemizing the goods received, specifying Irvineton as the end of their liability therefor and the usual precautionary conditions and exemptions from liability, was omitted in this instance, and it was agreed for a consideration, that the defendants' car should carry the goods to their destination without transhipment.

" Does all this contain an express contract, or the legal implication of one, that the defendant would transport the goods to Tidioute and deliver them safely to the consignee, who was the plaintiff himself ?   If so, of course it would be bound to do so, or be liable for not doing so, unless excused by some sufficient reason.

" Just here come in the points to which the plaintiff's counsel has invited our attention : * * *

" I think the doctrine presented in these points is essentially correct.   The plaintiff put the goods into the custody of the de-

[Pennsylvania Railroad Co. *v.* Berry.]

fendant—an admitted common carrier—and fails to receive them again. He has no knowledge or means of acquiring knowledge of how they were lost.

["I think the burden of proof is on the defendant to show by what means they were lost, or at least to show affirmatively that it was not through any default or negligence of its agents, or while the goods were in its possession or custody.]

"This is independently of the fact whether the defendant was bound by contract to carry them itself to Tidioute or see that it was done. If this be correct, then it becomes your duty, in case you are not satisfied there was a contract, to inquire, whether the defendant has shown satisfactorily that the larceny of the goods was not committed until after they passed out of its possession and control, that is, not until after they were received and taken into custody by the O. C. & A. R. R. Co. If not, then the defendant would be responsible for the deficiency. Having charged and collected pay for the faithful and full performance of duty at the end of the route, no less should be required of it than to show affirmatively where and how the loss did occur, to exempt itself from the legal presumption of negligence, and afford the plaintiff the means of redress.

["A formal receipt of another party, taken in the usual course of business, upon the transfer of goods, is not sufficient, especially when the evidence does show affirmatively that no itemized bill of lading accompanied them and no examination of them was made to discover the fact of loss. The receipt of the receiving company, given under such circumstances, would not be conclusive.]

"The question of the liability of a railroad company for goods billed and shipped to a point beyond the terminus of its line of road, is not fairly raised in this case, because there was no bill of lading or receipt given. Where there is a business connection between the different companies throughout the route and the consignor has reason to believe that the company to whom he delivered the goods held themselves out as responsible for the entire route, he will be entitled so to hold them. The rule is well settled in the English courts that where a railroad company receipts property destined and directed to a point beyond the termination of their own road, they are bound to deliver it at the place of destination, without a stipulation to that effect. * * * [Such a rule is the only one consistent with the safety of the citizen and consignor, with common honesty and fair dealing, and the demands of this progressive age.]

"In this case, if you believe these goods were shipped under a special contract to be transported to Tidioute, [or with the reasonable and fair understanding by plaintiff that the Penna. R. R. Co. was to be responsible for their delivery there, then the defendant

would be and is responsible for their non-delivery, unless they have shown affirmatively and clearly how the goods were lost, and that it was without any fault or negligence on their part."]

The verdict was for the plaintiff for $309.15. The defendants took a writ of error and assigned for error, the parts of the charge in brackets, and the affirmance of the plaintiff's first point.

*J. R. Thompson,* for plaintiffs in error, cited Horne v. N. Y. & N. H. Railroad Co. 23 Conn. 502.

*W. D. Brown* (with whom was *J. A. Neill*), for defendant in error, cited Britnal v. Saratoga Railroad, 32 Verm. 665 ; Beckman and Johnson v. Shouse, 5 Rawle 189 ; American Express Co. v. Sands, 5 P. F. Smith 140 ; Hawkes v. Smith, 1 Car. & M. 72 ; Morse v. Brainard, 8 Am. L. Reg. (N. S.) 604.

The opinion of the court was delivered, May 8th 1871, by

AGNEW, J.—In view of the evidence certified to us by the judge who tried this cause, his charge was not entirely free from error. A carrier may bind himself to transport goods beyond the terminus of his own route and thus become responsible for the default of those he employs to carry the remainder of the distance, as we decided in Balt. & Philad. Railroad Co. v. Brown, 4 P. F. Smith 77 ; but the proof of the contract should be clear. Especially should this be the rule when the alleged contract would contradict the papers accompanying the transaction. The testimony of the plaintiff in this case was not clear on this point. He desired his furniture to be carried from Warren to Tidioute without transhipment, and spoke to the agent of the defendants for a special car to run through. The agent agreed to furnish the car, but denies any contract to carry the goods beyond Irvineton, the point of connection between the Philadelphia and Erie Railroad and the Oil Creek and Allegheny Valley Railroad. The plaintiff testifies that the contract was that the goods should go through to Tidioute without a change of cars, and that they should be charged a heavier rate for this advantage. The agent of the defendants explains this to be for *car* service. Now there is nothing absolutely inconsistent between this statement of plaintiff and that of Gemmil the agent. The car might be readily furnished to go through at a higher rate for car service, and yet without a contract to carry the goods beyond Irvineton. The manifest accompanying the goods is expressly from Warren to Irvineton. The sum charged in the manifest is but $8, which is proved to be the rate to Irvineton only, the residue of the freight being the charge from Irvineton to Tidioute. The release signed by Waid, who hauled the goods for the plaintiff, expressly states, "a lot of goods from Warren station to Irvineton." The copy of the receipt which Gemmil says he thinks he handed to Waid for the plaintiff when he gave the release, is express in its terms, "to be carried and

delivered upon the terms and according to the agreement above specified at Irvineton station on the above railroad." Waid does not remember having taken the receipt, yet is not certain. Now, while the learned judge did not err in submitting to the jury the question of the contract on the plaintiff's testimony, as its purpose was to be determined by them, yet it is clear he did not present the case so as to enable them to understand the true character and effect of the evidence. In this respect his charge was insufficient and tended to mislead.

We think he erred also in charging upon the receipt given by the Oil Creek and Allegheny Valley Railroad Co., upon the transfer of the goods at Irvineton. While, as he stated, the receipt alone would be insufficient to account for the loss of the goods, yet he coupled this statement with an allegation that the evidence showed affirmatively that no examination of the goods had been made to disprove the fact of loss. This and other portions of the charge were calculated to leave the impression upon the minds of the jurors that the case was really barren of evidence tending to show when and where the goods were lost, and thus to cast the responsibility upon the defendants. But there were circumstances strongly favoring the defendants, if their contract for carriage ended at Irvineton. The goods left Warren at 9 o'clock A. M. of the 3d of April 1868, reached Irvineton between 10 and 11 o'clock of that day, and were transferred to the custody of the Oil Creek and Allegheny Valley Railroad Co., at 2 o'clock P. M. That all the goods were placed in the càr at Warren, appears to be pretty certain. It is not probable that the articles lost were taken out in the daytime before the transfer of the car to the custody of the Oil Creek and Allegheny Valley Railroad Co. The car reached Tidioute the next day, which was Saturday, the 4th of April. The plaintiff himself admits in his testimony that he looked into the car on Saturday to see whether the goods were dry, and then saw the box of books, dining-table and box of bedding. Now the box of books and table were among the missing articles on the following Wednesday. It is evident, therefore, that these goods were taken out or stolen from the car after its arrival at Tidioute, rendering it probable that the others were also taken there. The plaintiff recovered for the books and table as well as all the other articles lost. Had the question upon the contract for carriage been properly submitted to the jury and found by them to end at Irvineton, it is obvious there was ample evidence to go to the jury tending to show that the loss occurred after the goods came into the hands of the Oil Creek and Allegheny Valley Railroad Co.; yet the tendency of the charge was to impress the jury with the belief that the loss was unaccounted for and that the responsibility for them lay upon the defendants. Taking the charge as a whole it tended to mislead the jury, and this, as has been repeatedly said, is error: Gregg *v.* Jamison, 5 P. F. Smith 468; Phil. & Read. R. R. Co. *v.*

[Pennsylvania Railroad Co. *v.* Berry.]

Spearen, 11 Wright 303; Garrett *v.* Gonter, 6 Wright 146; .Bailey *v.* Fairplay, 6 Binney 455, 466; Reeves *v.* Del., Lack. & West. Railroad Co., 6 Casey 454; Harrisburg Bank *v.* Forster, 8 Watts 304; Relf *v.* Rapp, 3 W. & S. 21; Hersheaur *v.* Hocker, 9 Watts 455; Parker *v.* Donaldson, 6 W. & S. 132; Bovard *v.* Christy, 2 Harris 267; Nieman *v.* Ward, 1 W. & S. 68; Keyser *v.* Evans, 6 Casey 507. I have collected these cases to show that the rule in recent decisions to reverse, when the effect of the whole charge is to mislead the jury, is not a novel one. It grows out of the Pennsylvania mode of bringing up the charge of the judge under the Act of 24th February 1806, reinforced by the Acts of 15th and 17th April 1856. It is ignorance of this mode which misleads those whose experience has never travelled out of the bill of exceptions given by the statute of 13 Edward II., chap. 31. The practice in this state, which under the Act of 1806 incorporates the charge into the record itself and enables an assignment of error to be made to it without any bill of exception whatever, is so well stated by Woodward, C. J., in Wheeler *v.* Winn, 3 P. F. Smith 122, no further comment is necessary. I may add, however, the following references to show the difference between the practice under the English statute and the Pennsylvania acts: Downing *v.* Baldwin, 1 S. & R. 298; Brown *v.* Caldwell, 10 Id. 114; Bailey *v.* Fairplay, 6 Binney 455, 466; Reigart *v.* Ellmaker, 14 S. & R. 121; Munderbach *v.* Lutz, 14 Id. 125. Under the Act of 1806, the evidence comes up under the certificate of the judge, the counsel being bound to make it up and present it for signature, the judge deciding what the evidence was when the counsel differ as to it. Thus the whole case is really before this court in the evidence and charge (as in the present instance), and the effect of the charge brought into view; and when it clearly tends to mislead by drawing the minds of the jury away from the true point of inquiry, or by putting aside a material aspect of the case, judicial notice will be taken of it. A charge which misleads differs from a mere omission to instruct: 6 Wright 146; 6 Casey 460. Justice demands this, and that it is the true purpose of every trial to reach.

Judgment reversed, and a *venire facias de novo* awarded.