## Congregation *against* Miles.

A vendee, in possession by articles of agreement, against whom an ejectment is brought to compel the payment of the purchase money, shall not be permitted to set up an outstanding title in a third person, to defeat a recovery by the vendor. If the title of the vendor be defective, the vendee may rescind the contract, but he must restore the possession of the land. And if a vendee continues in possession undisturbed until the statute of limitation has made the title perfect, he cannot then resist the payment of the purchase money.

WRIT of error to *Susquehanna* county.

This was an ejectment brought to recover part of two tracts of land, surveyed on two warrants, in the names of J. Dunlap and Susanna Woodrow, described particularly in the writ: defence was taken for one hundred and nine acres and one hundred and nineteen perches, also specially designated. The plaintiffs gave in evidence the warrants to John Dunlap and to Susanna Woodrow, each for four hundred acres, dated the 22d of February 1785; survey on each for four hundred and seven and a half acres on the 8th of October 1785. Deeds poll dated the 7th and 6th of May 1787, from John Dunlap and Susanna Woodrow to John Nicholson. Receipt to John Nicholson by receiver-general of land office for the purchase money on the above two warrants, and fifty-eight other warrants of the same date. They also gave in evidence the fifty-eight other warrants, and returns of survey on each of them made on different days in the autumn of 1785. Also, deeds poll from the several warrantees to John Nicholson, and deed (1788) John Nicholson to David Jackson, in trust for the heirs of Doctor Barnabas Binney, for twenty-five of the sixty tracts, not including the lands in question. Also, letters patent incorporating the plaintiff, dated the 11th of January 1759. On the 27th of January 1795, mortgage of John Nicholson to the plaintiff for the thirty-five tracts not sold to the heirs of Doctor Binney, for securing 13,687 pounds, 10 shillings and 6 pence. The plaintiff then gave in evidence the exemplification of a record, from Luzerne county, of a *scire facias* on this mortgage to April term 1800, and judgment thereon the 21st of November 1800 for plaintiffs for 13,687 pounds, 10 shillings and 6 pence, and interest from the date of the mortgage. In 1806 a *scire facias* to revive this judgment, and judgment on it: upon which a *levari facias* issued to April term 1806, which was returned, " sold two tracts in the names of Robert Lyon and Robert King to Joshua M. Wallace, for 142 dollars, and the thirty-three remaining tracts severally to plaintiffs: amount of sale, 4336 dollars 45 cents." Three deeds of James Wheeler, sheriff of Luzerne county, to the purchaser. On the 3d of September 1805, articles of

agreement were entered into by the plaintiffs with J. B. Wallace. By these articles the plaintiffs agreed to proceed on the above-mentioned mortgage and another mortgage, and obtain judgment against the heirs of John Nicholson; and to sell the lands, and cause them to be purchased; and then agreed to sell the thirty-five tracts above mentioned to John B. Wallace in fee: J. B. Wallace to give a bond and warrant to confess judgment for 28,526 dollars, conditioned to pay 14,262 dollars 50 cents within fifteen years, and to pay the interest yearly; and further, as security for the payment of said debt, to give to the said corporation a mortgage on such real property in Philadelphia as shall be satisfactory to them; and until he does so, *no deed to be given* to him for the lands. Then follows provision for the case of interference of adverse titles, and that said John shall adjust these, or try the rights, and to have an abatement in the price for so many acres as may be lost. A schedule was annexed specifying the thirty-five tracts. The 10th of October 1807, deed of Joshua M. Wallace to J. B. Wallace for the two tracts purchased by him at sheriff's sale. The plaintiffs then proved the execution of, and gave in evidence, articles of agreement dated the 4th of December 1811, between J. B. Wallace by his attorney Putnam Catlin, and Daniel Cone and Joshua Miles, by which Wallace agrees to sell, and Cone and Miles agree to purchase one hundred and sixty-three acres, particularly designated: deed to be made when the land is surveyed, and actual settlement made on the land: the purchasers to pay 3 dollars per acre, one-third in four years, one-third in five years, and one-third in six years, with interest on the whole from the date; and to give bond and mortgage on the premises. On the 19th of June 1817, the defendant Miles, and other purchasers from Wallace, agreed with J. W. Robison, then agent of Wallace, to give up their contracts: stated that they had not paid, money being scarce and times hard; and agreed to purchase at 5 dollars per acre, payable in four equal instalments. Plaintiffs then gave in evidence the power of attorney of J. B. Wallace to Putnam Catlin, dated the 11th of May 1809, giving him power to sell and convey lands in Luzerne county (this land was then in that county): and also a deed of the same, by his said attorney to Joshua Miles, for sixteen acres, part of J. Dunlap's, with a saw-mill and grist-mill thereon; consideration 350 dollars. This is part of the land contended for in this suit. On this purchase the proof was that he had paid about 40 dollars, and no proof of any other payment on either purchase. Plaintiffs then proved that John Nicholson came to that country about 1792, and traced the line between the tracts sold to Binney and the others: that at that time John Smith and John Hutchison were living on the tracts in the names of J. Dunlap and Susanna Woodrow, under John Nicholson. In a few years Smith moved away, and his improvements went into the possession of Hutchison, who acknowledged he held under Nicholson. Some time afterwards, Hutchison sold to Page, and Page sold to Teuxbury, who sold to Joshua Miles, Sen. The whole tracts

being in possession of his father under the plaintiff, or rather origi-
nally under Nicholson, whose right became vested in the plaintiffs,
the son contracted as above stated, and went into possession. It thus
appeared that John Nicholson had what was *prima facie* a perfect
legal title : that he also was in possession by his tenants: that he
mortgaged the lands to the plaintiffs .to secure the payment of a large
sum of money : that failing to pay the mortgage, he was sued : that
plaintiffs became the purchasers, and contracted to sell to Wallace,
who went to the lands and contracted to sell to defendant.    There
was no evidence that Wallace had paid any thing to the plaintiffs,
or that the defendant paid to Wallace or plaintiff any more than 40
dollars.    Plaintiffs stated at the trial, and in this court, that they only
asked a verdict, to be released on payment of 1 dollar per acre and
interest, according to the contract between plaintiff and Wallace :
that having the legal estate they claimed the possession, unless the
defendant did equity by paying what had been agreed to be paid to
the plaintiffs.

Defendant then offered to prove by Mr Catlin, that when he en-
tered into the agreement on the part of Wallace with the defendant,
he and defendant both thought Wallace had a good title to the land.
That he, Catlin, never knew that Wallace had neither paid for the
land or got a deed for it, until about 1825 ; nor did he know of any
other objections until about the same time.    He also proved, that in
1792 John Nicholson was shown the lines of survey of the adverse
title, hereafter mentioned : and he said the owners had turned tories,
and their lands had been confiscated ; and it was the same as if the
rights had never been taken out.    He offered to prove that defendant
had made large and valuable improvements since his purchase ; had
re-built the mills, &c., worth now above 5000 dollars; and to show a
warrant to Benjamin Chew, dated the 20th of August 1774, for three
thousand acres on the waters of Meshappen creek ; and a survey of
two thousand seven hundred and eighty-six acres and nineteen
perches in September 1775. Also, a deed *quinquepartite*, signed by
Benjamin Chew, the warrantee above named, Andrew Allen, Samuel
Meredith, Edward Shippen, Jun., and Joseph Shippen, Jun., declaring
that the tract above named, and several others, in all thirty-six thou-
sand acres, were held by them in partnership.    That a certain
Robert Wilson was to have one-fourth for discovering and locating,
and the remaining three-fourths were to be divided equally among
the five.    This is dated the 16th of October 1775.    Also, the act of
assembly of the 6th of March 1778, attainting Andrew Allen, with
others, of high treason, and forfeiting his lands to the state ; and the
supplement to this act, passed the 29th of April 1779.    Also, the
proceedings of the supreme executive council, on a petition of Charles
Stewart, guardian of Robert Wilson's children, praying for a partition.
The appointment of John Leekins, surveyor-general, David Kennedy,
secretary of the land office, and Francis Johnson, recorder-general, to
act for the state ; and their report showing a partition agreed on by

[Congregation v. Miles.]

all but Joseph Shippen, who did not appear. By this the above tract in the name of Benjamin Chew of two thousand seven hundred and eighty-six acres and nineteen perches, and a tract on warrant to Andrew Allen of three thousand and eighty-seven acres and thirty-nine perches, making together five thousand eight hundred and seventy-three acres and fifty-eight perches, were allotted to the state; and confirmation of this report by the supreme executive council. These proceedings are from the 1st of September 1789 to the 9th of October 1789. Also, 30th of April 1787, a patent from the commonwealth to Samuel Meredith for the tract in the name of Benjamin Chew, above mentioned; and a conveyance of it to the commonwealth on the 10th of July 1800, indorsed on the patent, and filed in the proper office. Also, that the other partners have sold the parts allotted to them by the said partition, to individuals, and they again to others in small tracts, who went into possession, and improved, from thirty to forty years ago. And that the lands on which defendant lives are inclosed in said survey for Benjamin Chew, allotted and conveyed as above mentioned to the state.

To all this evidence, collectively, and to each part of it, the plaintiff objected; but the court overruled the objections, and sealed bills of exception.

*Jessup* and *Conyngham,* for plaintiffs in error.
*Greenough,* for defendant in error.

The opinion of the Court was delivered by

Huston, J.—The court overruled all the objections made in the court below to the admission of deeds in evidence, and several bills of exception were taken; in some of which there was error, such as admitting a deed to be read on proof of the handwriting of one witness, without proof that the other witness was dead, or that any inquiry had been made for him. I pass over these, because I suppose the court below intended to have the main and great question decided by this court.

Before I proceed to discuss this cause it may be proper to notice the case of Bagley v. Wallace, 16 *Serg. & Rawle* 245. The suit there was for an adjoining tract which Wallace had purchased from some one other than the plaintiff. He had shown a deed for the land. It was common in this state, at one time, to give leases to settlers on wild lands, with a clause giving a right to purchase. However it may have been, Wallace had bought out the person in possession, and then sold to one Joseph Miles, who died in possession; his administrators sold all his right, by order of the orphan's court, to J. W. Robison, the agent of Wallace, who exchanged with defendant, and got other lands for it; and for the balance gave a mortgage to Wallace, on which suit was brought. In that case the defendant had given to Wallace another tract of land, with, so far as appeared, a good title, and had got a bad title, and given a mortgage for the

[Congregation v. Miles.]

balance. In the case before us the defendant has not yet given any thing. In that case this court did not investigate every point so fully as might have been done, because we held the opinion, so forcibly expressed by the judge in the opinion of the court, that the state would release its claim ; and, in point of fact, Chapman, having agreed to pay, applied to the legislature, who, by the act of the 15th of April 1834, released all right to the land he occupied ; but when the plaintiffs, at the same time, applied to obtain a release of the land in question, the defendant opposed the passage of the law ; and others situated as he is joined him.   The defendant, then, comes before us as a person to whom the land was shown by Wallace ; who agreed to buy from him, supposing, we may admit, that Wallace had a title, but not inquiring whether he had one.   Wallace, it seems, had no title ; he had agreed to purchase from the plaintiff; but, so far as we can see, had paid nothing, and got no title.   Defendant has paid nothing.

I admit, according to the opinion in Bagley *v.* Wallace, that the supreme executive council had no express power to make the partition ;(a) but I may observe that that body exercised much authority clearly unwarrantable, and yet their acts have in many cases not been declared void or rescinded.   I admit fully that the officers of the land office had no right to sell escheated or forfeited lands as vacant lands, at 10 pounds per one hundred acres ; nor had they any right to sell, as vacant, any lands which had been granted by the proprietor, and surveyed and returned ; but I do not admit that warrants granted and paid for, and surveyed and returned, were void because they covered lands before appropriated : they were voidable ; but if the lands were taken possession of, and occupation was continued for twenty-one years, the act of limitation made the title valid against the owner of the prior warrants.   Now, taking the partition to be void, the one-fourth of the warrant to B. Chew was vested in Wilson, and fourth-fifths of the remaining three-fourths were vested in B. Chew, Samuel Meredith, Edward Shippen and Joseph Shippen.   The act of limitations has made the title of the plaintiffs good to all but one-fifth of three-fourths ; for the possession of the occupants has been under the plaintiffs or Nicholson, whose right they have.   And the possession of a tenant in common, claiming as his own, and acting as owner, is protected by that act.   Frederick *v.* Gray, 10 *Serg. & Rawle* 182.   There is, then, only the one-fifth of three-fourths outstanding in the state ; and, admitting that the act of limitations does not run against the state in such a case as this (and I admit it with reluctance), still courts and juries, at the ex-

(a)   Though the sixth section of the act of the 6th of March 1778, says : " The president or vice-president shall inquire as to all estate, real and personal, &c. &c., and sell ; and under the hand of the president or vice-president, and the state seal, convey the said real estates, *after the claims relating to them respectively shall be determined ;* or may dispose of them in the manner hereinafter provided:" that is, sell them at public auction.

piration of some length of time, will be justified in presuming a grant, even where it is pretty certain none was made ; but it may be presumed, because there must at some time be an end of uncertainty of title.

In England, whence our ancestors brought most of the principles which are the foundation of our law, the legal title must prevail in an ejectment; and this defendant, in that action, would not be heard. A purchaser on *articles of agreement*, who has been put into possession, and who has paid all the purchase money, is not heard in an ejectment; he must yield to the legal title But he may go to a court of chancery, and there he may and will, if he makes out a proper case, be relieved; possession will be restored, and the vendor compelled to make a deed : but this is never done except where he has fulfilled, or offers to fulfil the contract on his part. No case can be found where a vendee under articles has been allowed to hold the land, and also to keep in his own pocket the price he agreed to pay for it. If the title is not good, he may refuse to accept; and, on delivering up the possession, may, in ordinary cases, recover any money he has paid. The law, and the practice under it, are the same in New York, and all the states where they have a court of chancery. Such a court, by the nature of its practice and forms, is peculiarly adapted to such cases. It, where the case requires it, gives its decrees, imposing duties and requiring acts to be done by each party ; and it suspends the final decision till inquiries are made under its direction, and modifies its final decree according to the result of such inquiries.

In this state we attain the objects by a different proceeding. A vendee under articles of agreement for the purchase of lands, pays or tenders the money due, and brings an ejectment to recover the possession ; and, if he has complied with his part of the contract, he recovers the possession. This is instead of a bill in chancery for specific performance ; and here he will recover possession wherever a chancellor would decree specific performance.

On the other hand the vendor by articles, if he has complied with, or offered a compliance with his part of the agreement, may bring covenant or debt for the purchase money ; or, if he prefers it, may bring an ejectment on his legal title. This is often called an ejectment to compel the payment of the purchase money : but it may eventuate in a verdict for the defendant if he has fulfilled his part of the contract ; or there may, if money is due from the defendant, be a verdict for plaintiff, to be released on defendant paying the sum due, which sum is ascertained by the jury and forms a part of their verdict inserted on the record. Or if the defendant objects to the title of the plaintiff, or for any other cause wishes to rescind the contract, the plaintiff gets judgment, and the possession is restored to the seller. If such defendant has paid any part of the purchase money, he may, if his contract require it, recover it from the plaintiff by the proper action. An ejectment, then, by a vendor may

be to compel the payment of money; but defendant may always make it eventuate in rescinding the contract, by suffering plaintiff to recover the possession.

I think no chancellor ever decreed, or was asked to decree, except under peculiar circumstances, some of which I will hereafter mention, that a vendee under articles of agreement, *who has entered into possession under those articles,* shall hold the land, and not pay the price. The allegation that he may do so is peculiar to some lawyers in some parts of this state, and is a discovery not many years old. It has not, however, received countenance in this court, or much in any court. We have adopted the chancery principle, that he who asks equity must do equity. The vendee, then, who has entered under articles of agreement must pay for the land, or restore the possession to his vendor; neither law nor equity, nor the common sense of justice as understood by every man, will permit that he shall agree to pay for land and obtain possession under that agreement, and then retain the possession and never pay. If he dislikes the title, and does not wish to pay, he can rescind the contract, restore the land, and keep his money, and, in some cases, recover damages; but cannot obtain the property and keep the price.

Where he did not enter under the agreement, the law may be otherwise. To be more explicit, every person in possession of land, not under contract with any person, may continue in possession until some one, having title, asks to remove him. Suppose a man settles on land to hold it by improvement, as he may hold it against every man if it is vacant, or against one having right to it if permitted to continue his possession twenty-one years, claiming it as his own; he may, in process of time, hear that it is appropriated, or he may see some lines or corners which induce a suspicion that it is appropriated by warrant and survey. I come to him and inform him I am the owner, and by falsehood or threats I induce him to enter into articles of agreement to purchase the land and pay me, or to take a lease and pay me rent and deliver possession to me at the end of the lease: he discovers I have no title to the land, and refuses to pay or give up possession; I cannot recover from him in ejectment, nor recover the money in debt or covenant; I did not *put him in possession;* he did not enter in pursuance, or in consequence, of his contract with me; he got nothing from me; his possession was good against me; he was deceived by me. See Hamilton *v.* Marsden, 6 *Binn.* 45; Miller *v.* M'Brier, 14 *Serg. & Rawle.* But if I had put him in possession, if he had entered in pursuance of his lease or contract with me, he cannot set up an outstanding title against me, nor purchase an adverse title and defend under it against me. Gallaway *v.* Ogle, 2 *Binn.* 468; Congregation *v.* Caufman, 6 *Binn.* 62.

A man may have a title to land by warrant and survey, by improvement, or otherwise, and there may be an older warrant and survey, or title, in some other way better, existing in some third person; but if the

[Congregation v. Miles.]

owner of the inferior title can take actual possession, by himself or a tenant, or one claiming under him, and retain that possession twenty-one years, the title may become perfect. Such person may be anxious to get actual possession by himself or some one under him; and if he has a title, though defective at the time, against some third person, and makes a lease to a man who enters under such lease, or enters into articles to sell to a man who goes into possession under those articles, such tenant or vendee on articles, cannot hold the land and pay no rent or no purchase money—he cannot buy the adverse title and set it up; he must go out of possession and restore the property to his landlord or vendor, and then he may bring suit on his adverse title, and, if it is good, recover on it. Good faith, honesty, and the peace and order of the community require that he who has acquired possession under a contract not tainted by fraud, should not use that possession to the injury of him from whom he received it. If such purchaser of a defective title is sued for the purchase money, I don't say it can be recovered from him in all cases; he may show that the seller cannot give him a good title, and ask to have the contract rescinded, and it may be rescinded; but if he obtained the possession under that contract, if it is rescinded, it must be rescinded in whole and on both sides, and he gets clear of the contract by restoring the possession and moving off the land. But if such vendee continues in possession, undisturbed, until the statute of limitations has made the title perfect, he cannot then resist the payment of the money in a suit for it; much less can he sustain a defence against an ejectment by a vendor—which form of action leaves it optional with him to pay the money, or rescind the contract and give up the land. To one-fourth of the land, and to four-fifths of the remaining three-fourths, the title is unexceptionable, and for so much there is no colour of defence. As to the remaining fractional part, there might have been colour of objection, and after what the legislature have done in the case of Chapman, above mentioned, it is no more than colour; but under the circumstances of this case, before detailed, that the executive council knew all the facts in 1789, a deed was made to the state and accepted and filed in 1800, and nothing done to assert the state's right for half a century after receiving pay for the land from Nicholson; that whether Nicholson knew of the adverse title before the proceedings in 1789, is doubtful; that there is no colour for supposing the plaintiffs knew of any adverse title till more than thirty years after they took their mortgage; that some hundreds have laboured, and bought and sold parts of this stale claim, for half a century; it would be too much to suppose the state will ever disturb the defendant; and if to this we add, that, when asked, the state released to one, and defendant has endeavoured to prevent, and perhaps his endeavour and that of those who joined him, did prevent, a release by the state to the plaintiffs, when it is not easy to see any motive for his opposition, except the dishonest wish to keep property and not pay for it, we are of

IV.—U

opinion that this small stale possibility of a claim is not, to this man, a defence.

As to the improvements, it is idle to talk about a man keeping the property of another, because he has improved on it ; he is not asked to pay for his improvements ; he is only called on to pay a dollar an acre, and interest since the contract. The whole evidence offered, if all true, is no defence, and clearly, what cannot avail, if proved, ought not to go to the jury.

Judgment reversed, and a *venire de novo* awarded.