[See Case No. 13,067.]

SMITH (HOLMEAD v.). See Case No. 6,630.
SMITH (HORTON v.). See Case No. 6,709.

## Case No. 13,062.

### SMITH v. HOUTZ.

[25 Leg. Int. 244; [1] 15 Pittsb. Leg. J. 409.]

Circuit Court, W. D. Pennsylvania. July, 1868.

COURTS — FEDERAL JURISDICTION — FOLLOWING STATE PRACTICE—PUBLIC LANDS—SURVEY —PLAT—WARRANT—VACANT LANDS.

1. Jurisdiction of the circuit court of the United States in civil cases. Courts of the United States, in their decisions, are independent of the courts of a state, except as to the laws regulating landed property.

2. As to these, when they differ, the courts of the United States are governed by the decisions of the supreme court of the state.

3. Where surveys are made and returned into the land office in blocks, they are to be located, on the ground, in blocks.

4. If any of them are found to interfere with tracts belonging to the older blocks, the younger must give way to the elder.

5. The marks on the ground really constitute the survey, and determine the rights of the party. The plot or diagram returned to the land office being only evidence of the survey. Where they differ, the latter must yield to the former.

6. The act of 1785 requires that every survey made, and to be returned upon warrant, shall be made by actually going upon the ground and marking the lines—otherwise it is clandestine and void.

7. A "chamber survey" is where the surveyor contents himself with plotting out a supposed survey, in his chamber, with all the appearance of an actual survey, and returns it to the land office.

8. Such survey, not returned, is utterly worthless and void. But if returned and accepted, it is not void, but voidable, and a new survey may be made upon the same warrant upon an order of re-survey.

9. Warrants only authorize the survey of vacant lands, for they, alone, belong to the commonwealth to grant.

10. Whether lands are vacant or not, the surveyor general and his officers do not undertake to determine, and, in many instances, have not the means of ascertaining. Of that the applicant must judge for himself.

11. It is against conscience, to take out a warrant, if the warrantee knew that the lands were appropriated by prior right.

12. For decisions upon other questions see the answers of the judge to the points submitted.

This is an action of ejectment for two tracts of land in Clearfield county. What gives it consequence is, that the decision affects titles to farms and timber lands of great value, and

[1] [Reprinted from 25 Leg. Int. 244, by permission.]

covering an area of many miles around the lands in controversy. To the old land lawyers of Pennsylvania, the legal principles decided, will seem familiar. By the juniors of the profession this report will be appreciated. The history of the case, the trial of which occupied nearly a month, will be found in the charge by the court to the jury.

John G. Miles, Henry D. Foster, J. B. McEnally, and Thomas J. Keenan, for plaintiff.

Mr. Purviance and H. B. Swope, for defendant.

McCANDLESS, District Judge (charging jury). The jurisdiction of the circuit court of the United States, in civil actions, extends only to cases between the subjects of foreign nations and citizens of the United States; and to cases between citizens of the United States residing in different states. Also to cases of patents for new and useful inventions, and to all actions where the government is a party. Pruner and Burley, the warrantees, being citizens of Pennsylvania, could not sue another citizen of Pennsylvania, but would be compelled to resort to the courts of Clearfield county, where the lands lie. Their vendee, Samuel C. Smith, being a citizen of New Jersey, gives us jurisdiction. This provision was designed to give citizens of other states a forum, free and unembarrassed by the supposed partialities and prejudices which might exist in the locality of the subject matter in controversy. Jurors in the federal courts are selected from the body of an extensive district, which, in this district, is two-thirds of the territory of Pennsylvania. You come here wholly ignorant of the parties or the subject matter, and after a patient hearing of several weeks, whatever your decision may be, the parties are bound to presume that they have had a fair and impartial trial, before an upright and enlightened jury.

Except life and liberty, there is nothing so important to the citizen, as that the rules of property should be known and certain, and that he should feel secure in the enjoyment of his title. What gives gravity and significance to this case is, not merely the land immediately in dispute, but the fact that its result may affect and unsettle surveys for miles around, and disturb parties who have been for years in the peaceable and quiet possession of their lands. In all matters of litigation, the courts of the United States are independent of the courts of the state, with the exception of the laws regulating landed property. However we may differ on these questions, we are bound by their decisions, and it always affords us pleasure to concur with them in opinion. In the conclusion, therefore, at which you and the court may arrive, in the adjudication of this case, we shall be guided and governed by the land laws of Pennsylvania.

With these preliminary observations, we shall now proceed, as briefly as possible, to consider the merits of the controversy which has oc-cupied nearly four weeks of your time. This is an action of ejectment brought by Samuel C. Smith against Dr. Daniel Houtz, to recover between six and seven hundred acres of land in Clearfield county. The plaintiff derives title by two warrants from the land office, one dated 3d October, 1859, to E. J. Pruner, a survey by H. P. Trezulney for Mr. Cuttle, the deputy surveyor, which was accepted at the land office on the 29th of the same month, and a patent from the commonwealth, dated the same day; the other warrant to Jacob Burley, dated the 3d October, 1859, survey made by the same person, on the 15th October, returned and accepted on the 29th, and a patent issued on the same day. Both of these surveys have a warning written upon them by the deputy surveyor, that they are believed to interfere with the surveys of 1793. On one it is said, "the above survey is believed to interfere with the surveys made in 1793 on warrants granted to George Bickham and Benjamin Johnston," &c., and on the other, that. "the above survey is believed to interfere with surveys in the name of George Bickham, William Shaff, Jacob R. Howell, &c., made on warrants dated in 1793." With this notice of prospective litigation, the plaintiff accepts a deed from Pruner and Burley, on the 30th December, 1864, for the consideration of $17,000, for what his grantors paid the commonwealth about $200, five years before.

Thus far, this shows a prima facie case for the plaintiff. To repel this the defendant exhibits warrants to Bickham, Howell, Wm. Johnston and Loast, dated in 1793, surveys regularly made and returned into the land office, patents to Richard Peters, and with the exception of one deed, deduces a regular legal title from Morgan, Rawle and Peters, the owners of a batch of thirteen surveys, through the Bank of North America, at Philadelphia, and the representatives of the Rawle and Peters estate, by deeds dated in May, 1853, to Daniel Houtz, the defendant. They further show a continued possession by the payment of taxes from 1805 to 1863, a period of nearly sixty years. They then call the deputy surveyor, who locates their surveys on the land in dispute and within the surveys of 1793. This, being the elder survey, must prevail unless the plaintiff can show you that the location was not made there, but upon other and different ground, and that is a question of fact for the determination of the jury.

Here really begins the wager by battle—the point in controversy. The plaintiff throws down the gauntlet which is promptly taken up by his adversary, with what success you must decide. The plaintiff shows the warrants, surveys and patents for the surveys of 1784, and also the warrant and survey of 1794 on the north, and the residue of the batch of thirteen, of 1793, relying upon that of Casper Haines as the leading warrant, by the location of which as contended for by him, all the rest are to be governed. This warrant calls for "400 acres on the north side of Big Mushanon creek,

and west of the upper Beaver dam, beginning at a beech, corner of land surveyed for John Musser & Co., bounded on the southeast by a line of marked trees, that run south fifty degrees west, and to extend north and westwardly." It will be well for the jury to keep in mind this description. The plaintiff claims that this warrant was located west and north of the line of the surveys of 1784, beginning at the Anderson white oak, and to sustain this position calls five surveyors, Mr. Africa, Judge Guinn, Mr. Trezulney, Mr. Moore and Mr. McCloskey. They do so locate it, but their testimony as to what they found upon the ground was more of a negative than of a positive character. They found some lines and corners which corresponded with the surveys of 1793, but omitted or failed to find others, and they did find a line at the southern base which carried them into, and overlapped the Phillips surveys. That line was so faintly exhibited on the plaintiff's map, that I requested Mr. Africa to define it more distinctly in the one before the court, and which exhibits on that side a correspondence with defendant's location. It could not be expected that at the period when these gentlemen ran the lines the artificial marks upon the trees made in 1793, would manifest themselves as distinctly to them, as they did to surveyors of an earlier date. These are liable to decay, but natural objects, such as rocks, streams of water, beaver dams, &c., are more durable and more satisfactory.

It is not my purpose to advert further to the testimony of these witnesses. You have heard it ably and eloquently discussed by distinguished lawyers, and it is your province, and not that of the court, to decide upon the facts. Does it satisfy you that the Casper Haines warrant was actually located on the ground, as claimed by plaintiff, and that on their map it is "on the north side of the Big Mushanon creek, and west of the upper Beaver dam." Has it satisfied you that the Haines survey on the ground, "begins at a beech, corner of land surveyed for John Musser & Co.," and is bounded on the southeast by a line of marked trees that runs south fifty degrees east," and that it extends "north and westwardly?" If I am not mistaken, in the connected draft from the land office, the Casper Haines should lie in the same range with the Benj. Johnston, part of the boundaries of which seem well defined. Is it clear to you that the Casper Haines was the leading warrant actually located on the ground, or were the other twelve of the block first surveyed, and the Casper Haines afterwards, being on irregular lines blocked at home by the deputy surveyor, and returned to the land office? These are questions of fact for you.

There are one or two legal principles to which I here invite your attention. These thirteen are to be treated as one survey. As Chief Justice Woodward says in 8 Casey [32 Pa. St.] 355: "Where surveys are made and returned into the land office in blocks, they are to be located on the ground in blocks. If any of them are found to interfere with tracts belonging to the older blocks, the younger must give way to the elder." As you have observed here in the surrender of a portion of these lands to the prior claims of the Phillips survey. Another legal principle, well established by a long current of authority is, that the marks on the ground constitute the survey, and determine the rights of the party; the plot or diagram returned to the land office being only evidence of it; and when they differ, the latter must yield to the former. Serg. Land Laws, 126. By the 9th section of the act of 1785, it is provided that every survey to be returned on any warrant issued after the passing of the act, shall be made by actual going upon and measuring the land, and marking the lines, to be returned on such warrant and every survey made theretofore was deemed clandestine and void, and of no effect whatever. This act has been deviated from in several ways. The deputy surveyor may never go upon the ground at all, but content himself with plotting out a supposed survey in his chamber, with all the appearance of an actual survey, and return it to the surveyor general. This is termed a chamber survey, and is a manifest breach of the law and of the officers' duty. Such survey, not returned, is utterly worthless and void. But if returned to the office, and accepted, as has sometimes been the case, it is not void so as to be treated as a nullity, and so that the warrant may be again surveyed, as if retaining all its original validity. 2 Watts, 397. Other legal questions will claim your attention, when I come to answer the points submitted respectfully by the counsel for the plaintiff and defendant.

We now recur to the defence. They give in evidence sundry warrants and surveys of 1793, 1794 and 1784, together with connected drafts of numerous tracts, and a certified copy of the purchase voucher which shows the John Roll's to be leading warrant of the surveys of 1784. It is described as "on the head of Mushanon creek, to include a large Beaver dam, above the upper forks of said creek." They then call Maj. David Hough, an old, intelligent and practical surveyor of thirty-five years standing familiar with this and the neighboring surveys, and who had run and blocked some of the lines in 1855 or '56, when some of the trees, dating to 1793, were green and standing. He made a subsequent survey in 1864, recognizing the old corners he had been at in 1856, and blocking not only the interior lines of the thirteen surveys, but the exterior of the Benj. Johnston, and found them counting to 1793. He also testified to the Dan. Turner reference line of 1792, and showed, I think, to the satisfaction of the jury, that whatever might be the discrepancies in that line, at the land office and upon the official drafts, that on the ground, there was no break in its entire

length, a distance of nineteen miles. And further, that according to the marks he found there, that that line would be the southeastern boundary of the Casper Haines survey. If you believe the testimony of that witness, and we see no reason why you should discredit him, that establishes the location claimed by the defendant.

The deposition of David Ferguson, a surveyor from 1806, since dead, shows that in 1829 he spent a week trying to make the batch of thirteen surveys fit the Vought and Anderson surveys of 1784, by the call of the Casper Haines for the Anderson white oak, and could not do it. That it could not be so located without abandoning all the marks on the ground, and this, we have it by other evidence in the cause, would extend to several miles. He says further, that the Benj. Johnston being an outlying tract, with its exterior lines well marked on the ground, blocking to date (1793) to make it correspond to the call of the Casper Haines for the Anderson white oak, would move it two tracts from its lines thus marked on the ground. This is strong evidence for the defendant's location. The credibility of the witness is for you. You have also the deposition of John D. Hoover, taken on a commission to Iowa, sustaining the same location. He ran the lines in 1852. Then Samuel Hagarty, who ran the lines as early as 1822, testifies to the lines and corners, then green and living, and counting to the date of the survey, 1793. Henry Haggarty corroborates this as to some of the trees which he saw in 1838, when he was in the company of the surveyor, John Hoover. Isaac Toss, who lived on the Henry Shaffer tract for twenty-four or twenty-five years, was present at a survey by Hoover in 1842, and proves the lines of 1793. And Abraham Toss says that, thinking there was some vacant land somewhere there, he got Mr. Trezulney to search for it, and that after running from the hickory down to the birch on the bank of the Mushanon creek, Trezulney said there was no vacant land there. It will be remembered that Mr. Trezulney was the surveyor who located the warrants under which the plaintiff now claims. The credit to be given to these several witnesses is a matter wholly for the consideration of the jury.

I do not know how it struck the minds of the jury, but to the court, after the testimony of Major Hough, that of Major Criswell shed a flood of light upon this case. He is evidently a gentleman of high intelligence, and a skillful and accomplished artist, perfectly at home in the woods and with a theodolite. After finding and tracing the lines of 1793, both the interior and exterior of the batch of "thirteen," so often repeated in your hearing, he took up the individual returns made to the land office. He then says: "With these surveys in my hand, and having been over the ground, I believe the surveys were located by the surveyor on the ground, as I

have found the marks; and that location is correctly represented upon the large map of the defendant." He then gives satisfactory reasons for the faith that is in him. "I find the marks of the date (1793) on the ground, and cannot find them anywhere else. I find both the artificial and natural marks upon the ground to correspond with it (defendant's location, as exhibited on the large map,) sufficient to relieve my mind of all doubt." He proceeds: "The official copy of the Geo. Bickham, which I hold in my hand, shows that the Casper Haines survey joins it on the east, and it shows that the Casper Haines lies there by the dotted line and the 'Casper Haines' written upon it, and that dotted line is called for north of the maple. In the location of the surveys as I find the marks on the ground, the hickory corner north of Beaver run (Beaver dam branch) is common to four surveys, to wit, the Howell, the Wm. Johnston, the Matlock and the Casper Haines. I find the Beaver run on the ground, about as represented by the official drafts of the Howell and the Matlock. By that location the southeast boundary of the Casper Haines intersects the Geo. Bickham line above the maple. The call of the Casper Haines designates a beech, corner of the Pigot, Shaw and Joseph Ashbridge, and calls for a line of marked trees running south fifty degrees west. That beech is found, and is within the boundary of the George Bickham survey. The Bickham, then, includes a portion of the ground called for in the Haines warrant. Finding no work on the ground for the Casper Haines of the date according to the location of either plaintiff or defendant, except the work from the hickory, on the north side of the Beaver branch, for the whole distance of the Casper Haines running south from there, and finding the surveys of the George Bickham, Jacob R. Howell, Israel Wheelan and Wm. Johnston well defined, I would locate the Casper Haines at that place on defendant's map. The calls for the John Anderson and Gilbert Vought, I do not consider as having been made after actual inspection, and going upon the ground, by the artist. But I do consider the Casper Haines a 'chamber' survey. And that from the fact that the Beaver dam branch as laid in the Howell and Matlock surveys, both of which the Haines survey calls for, is not laid down in the Haines. Neither are the streams, flowing into the surveys of 1784 from the north, laid on the survey of the Casper Haines as returned to the land office. According to the location of either plaintiff or defendant, water should be found flowing through the Casper Haines. The survey as returned shows no water. There is further evidence on the face of the papers, the returns of survey, which to my mind affords conclusive evidence that the artist did no work on the ground east of the north and south lines running from the maple to the hemlock sapling. The tier of surveys, of which the Casper Haines is one,

was protracted from the north and south line as found on the ground. One of the facts favoring such an opinion is that the stream (of water) as laid in the official return, flowing out of Wm. Johnston through the north west corner of the Joseph Matlock across the south east corner of the Robt. Hiltziman is erroneously made to run over a high hill, according to the papers." He testifies further "that the stream on the western boundary of the Benj. Johnston, flowing into Clearfield creek, is found upon the ground. A stream is called for in the official return of the Benj. Johnston." He concludes his examination in chief by saying: "From what appears on the ground, I could not make any other location than that on defendant's map. To obey the call for the Anderson white oak, would abandon all the work on the ground, and transpose all the corners."

If you believe this testimony,—and I do not see why you should disbelieve it, and if you believe the testimony of Maj. Hough, there is an end to the plaintiff's case. For I have already announced to you the legal principle, well established, that the artificial marks and natural boundaries, found upon the ground, control and are paramount to all the papers in the land office. It is therefore for you to say, whether there was any vacant land there at the date of the warrants to Pruner and Burley. The warrants only authorized the survey of vacant lands, for they alone belonged to the commonwealth to grant. Whether the lands applied for were vacant or not, the land officers do not undertake to examine or determine, and in many instances do not possess the means of ascertaining. Of that the applicant must judge for himself. But if he knew they were appropriated by prior right, (and in this case he was warranted by the caveat of the deputy surveyor) it was against conscience to take out a warrant for them, or to have them surveyed as vacant. 4 Watts, 150.

I will now proceed to answer the longer and shorter "catechism," propounded to me by the learned counsel of the plaintiff and defendant; and after that submit the case for your decision.

Plaintiff's Points—Answer of the Judge.

The plaintiff's counsel ask the court to instruct the jury as follows:

(1) That as the Casper Haines warrant was the leading warrant of the Morgan, Rawle and Peters batch of surveys, it was the duty of the deputy surveyor, in locating them upon the ground, to execute that warrant first, and the others in the order of their calls. 9 Casey [33 Pa. St.] 474.

Answer. Assuming the Casper Haines to be the leading warrant, this point is affirmed.

(2) That if in making that location the Casper Haines warrant was executed upon the old line of the surveys of 1784. in the names of John Anderson and Gilbert Vought as a boundary, and returned by that line as a bound-

ary, and by the white oak corner of the John Anderson survey, as a common corner of the Anderson and of the Casper Haines surveys, that location cannot be departed from in ascertaining the present position of the Haines survey upon the ground. 9 Casey [33 Pa. St.] 474; 10 Watts, 263; 4 Watts & S. 326.

Answer. If the jury believe from the evidence that the Casper Haines was actually located on the ground, by the Anderson white oak and the line of 1784, it cannot be departed from in ascertaining its present position.

(3) That if the Casper Haines survey was so located upon the line of 1784 as a boundary, and by the Anderson white oak, as one of its corners, there was no necessity for remarking either the corner or the line, and it would have been improper to do so; that if the marks of the date of the survey are not found upon either at the present time, it affords no presumption that the survey was not thus located. 3 Serg. & R. 283; 8 Watts & S. 139; 7 Barr [7 Pa. St.] 73.

Answer. The first part of this proposition is affirmed with the qualification that the jury must be satisfied that it was so located. If so, then the second branch of the proposition is true, and the absence of marks at the present time would afford no presumption that it was not thus located.

(4) That the fact that marks of the date of the survey are found upon a part of the old line of 1784, from the Anderson white oak, a short distance below the intersection of the short east and west line of the survey, raises a powerful presumption that the deputy surveyor did actually run that line upon the ground in executing the warrant, and did remark it, although the marks of that date may not now be found on the line. 3 Serg. & R. R. 283; 8 Watts & S. 139; 7 Barr [7 Pa. St.] 73.

Answer. We refuse so to instruct you.

(5) That the thirteen warrants of Morgan, Rawle and Peters having been shown to belong to one party or person, and to have been surveyed at one time as a block, the surveys are to be treated as one entire survey. 9 Casey [33 Pa. St.] 474; 7 Casey [31 Pa. St.] 348; 1 Wright [37 Pa. St.] 67.

Answer. This point is affirmed.

(6) That if the Haines survey was located upon the line of the Anderson and Vought surveys, and by the white oak corner as a common corner of the Anderson and Haines, surveys, that location must fix that corner and line as a boundary of the block on that side, and if the maple grub, as proved by Thomas Henderson, is a corner of the Benjamin Johnston and Thomas Maston surveys, or of the Israel Wheeler, occupying the same ground as the Benjamin Johnston, that corner and the lines running south from it, to the southwest corner of the Thomas P. Wharton survey, those lines counting to the date of the surveys if believed by the jury to be the original lines of the block, and that corner will fix the

boundaries on the opposite side, and must have a controlling influence in determining the position and location of the entire block. See authorities already cited.

Answer. If the Casper Haines was actually located on the ground by the Anderson white oak, and it was the leading survey of the batch, it does not fix the eastern boundary of the batch, but it is for the jury to say whether a line running south from the maple grub in Henderson's field is the western boundary, when the Benjamin Johnston, by the official return of survey, is surrounded on three sides by vacant land, and three of its lines are well marked, and counting to 1793, the date of the survey, can establish the western boundary of the batch.

(7) That if the jury believe the Haines survey was located upon the Anderson and Vought line as a boundary, and the Anderson white oak as a corner of the survey, after the time that had elapsed since the making of the surveys constituting the block, they may presume the existence of the birch corner called for in the return of survey as a corner of the Robert Hiltzheimer and the Joseph Cox surveys on the line running north from the Anderson white oak, and that the line was run upon the ground from the white oak to the birch, even in the absence of marks counting to the date of the surveys, (if they shall not be satisfied that the marks found beyond the forked hemlock was an original mark of the survey,) and the line running north from the white oak to the birch, and from the birch to the northeastern corner of the Jacob Cox survey, will fix the boundary of the block on that side. 10 Casey [34 Pa. St.] 462; 3 Casey [27 Pa. St.] 9; 2 Watts & S. 18; 1 Watts & S. 79.

Answer. We refuse so to instruct you. The jury cannot presume a state of facts that dislocates and abandons all the interior lines of the block which are proven to have been found upon the ground.

(8) That after the length of time which has elapsed since the return of the surveys constituting the block in question (being more than twenty-one years) they are now to be presumed not only to have been regularly made, but to have been made upon the ground as returned 'n the surveyor general's office. See authorities of 7th point.

Answer. Such is not the law as decided by the supreme court of Pennsylvania in 12 Wright [40 Pa. St.] 431, and we refuse so to charge you.

(9) That if the jury are satisfied from the evidence that the general location of the block of thirteen surveys as claimed by the plaintiff is more in accordance with the return to the office of the surveyor general than that of the defendant, that location is to be adopted by them as the true one.

Answer. This is refused,—the marks found upon the ground override and control the returns in the surveyor general's office.

(10) That where there are conflicting lines and corners upon the ground, the presumption of law is in favor of those which agree with the return and against those which would do violence thereto.

Answer. Such a presumption might exist if there was uniformity and correspondence in the returns made to the land office; but, as the official papers produced upon the trial exhibit a conflict in the land office as well as on the ground, no such presumption can avail.

(11) That if a survey has been returned for more than twenty-one years, it must be presumed not only to have been rightly made, but the records of the land office must furnish the best evidence of what was done by the surveyors and others who are not now living to give evidence on the subject. 10 Casey [34 Pa. St.] 462; 3 Casey [27 Pa. St.] 9; 2 Watts & S. 18; 1 Watts & S. 79.

Answer. This would be the law if there were no marks on the ground conflicting with the returns of survey; but if there are, then the location on the ground governs and controls, all the papers in the land office.

### Defendant's Points.

The court is respectfully requested to instruct the jury as follows:

(1) The marks on the ground dating to 1793, corresponding with the thirteen surveys constitute the true survey, and control all calls for older surveys, or other fixed boundaries. Walker v. Smith, 2 Barr [2 Pa. St.] 43; Hall v. Tanner, 4 Barr [4 Pa. St.] 247; Henry v. Henry, 5 Barr [5 Pa. St.] 249; Mahon v. Duncan, 1 Harris [13 Pa. St.] 463; 5 Rawle, 350; 10 Wright [46 Pa. St.] 484.

(2) If the jury believe there is a preponderance of marks of 1793 suiting the location of the defendant which would be abandoned by the plaintiff's location, their verdict should be for the defendant.

(3) The marks of 1807, and all marks of a later date than 1793, are to be entirely disregarded by the jury in determining the location of the thirteen surveys.

(4) The location of the surveys of 1794 cannot in any way affect the location of the surveys of 1793. The junior surveys having been received as a species of hearsay evidence, and only equivalent to the declaration of a deceased surveyor as to where he believed the location of the older surveys to be. Bellas v. Cleaver, 4 Wright [40 Pa. St.] 268.

(5) The warrant of Casper Haines being descriptive, its proper location is a question of fact for the jury; and if they believe the Beaver dam, the beech, and the line of marked trees, running south fifty degrees west, called for by the warrant, to be on the ground as claimed by the defendant, it is powerful evidence taken in connection with the lines of 1793, on the ground south of plaintiff's location, to sustain the position claimed by the defendant.

(6) Before the jury can find that the lines and corners of 1793, on the ground south of the plaintiff's location, were abandoned by

the surveyor who laid the warrants, they must be satisfied either that he obliterated the marks or made new marks corresponding with his return. Walker v. Smith, 2 Barr [2 Pa. St.] 45; 4 Watts & S. 78.

(7) If the jury believe the testimony of defendant's witnesses, that the hemlock sapling, the locust, the hemlock, the hickory, the birch and maple on the one line; the white oak, the double sugar, the hemlock, the pine and the hemlock on the other line; and the maple and pine on the western end of the Benj. Johnston, as defendant lays it, were, on the ground, marked as corners to 1793, with lines to and from them of the same date, corresponding with the thirteen tracts, these corners and lines constitute the survey, control the call of Casper Haines for the white oak and surveys of 1784, and the verdict must be for the defendant. Malone v. Sallada, 12 Wright [48 Pa. St.] 426, 428, 430.

(8) In determining the location of the block of thirteen surveys the jury is to be guided by the following rules: 1. The artificial marks on the ground constitute the survey, and are the highest proof of location. 2. The next most important evidence of location is natural objects, especially streams of water. 3. In the absence of both of them, and then only, adjoining surveys called for are to be resorted to. 4. The location may be determined by fixing any one of the block, whether the leading survey or not, by the marks on the ground, and then laying the rest in their order as returned into the land office. Gratz v. Hoover, 4 Harris [16 Pa. St.] 235.

(9) If in accordance with these rules the jury believe that the Howell and Bickham surveys, under which the defendant claims, and for which he takes defence, are fixed upon the ground by the pine, hemlock, maple, birch and hickory corners called for, and by lines blocking back to the date of the surveys; they may fix the location of the body by laying the other tracts to adjoin them as returned into the land office, without regard to the call of Casper Haines for the surveys of 1784, and their verdict should be for the defendant.

(10) In the location of the survey the configuration of the block is to be preserved, and it cannot be distorted or dislocated by laying one survey upon another. The Benj. Johnston calls to adjoin the William Sheff and for vacant land on three sides; it is therefore an outlying tract on the face of the papers and must be located accordingly.

(11) If the jury believe that the lines of Benjamin Johnston, as an outlying tract, are upon the ground, counting to the date of the survey, and that the maple and pine called for, as its western corners were upon the ground, as claimed by defendant, it fixes the location of the block, and the verdict must be for the defendant.

(12) The undisputed testimony of the surveyors of both plaintiff and defendant establish the fact that the lines on the ground, blocking back to 1793, and corresponding with the thirteen surveys, interlock with the older surveys of Phillips, and therefore no vacancy exists upon which the plaintiffs could lay their warrants, unless the jury is clearly satisfied that these lines and corners on the ground were obliterated or abandoned by the surveyor who made the return, of which the interference and the location of junior surveys are not sufficient evidence.

(13) As plaintiff's surveyors, Africa and Moore, concur with defendant's surveyors, Hough, Cuttle, Criswell, Ferguson and Hoover in saying that they would locate according to the defendant's plot, if they found the lines and corners therein designated, dating to 1793, if the jury is satisfied that such lines and corners were upon the ground, their verdict should be for the defendant.

PER CURIAM. These points are each and all affirmed.

The jury returned a verdict in favor of the defendant.